Tallulah **MORGAN** et al.,
**Plaintiffs-Appellees,**

v.

**John J. McDONOUGH** et al.,
**Defendants-Appellants.**

**No. 75–1482.**

United States Court of Appeals,
First Circuit.

Argued Jan. 9, 1976.
Decided Aug. 17, 1976.

528

James J. Sullivan, Jr., Boston, Mass., with whom Francis J. DiManto, Matthew T. Connolly, Philip T. Tierney, and DiMento & Sullivan, Boston, Mass., were on brief for defendants-appellants.

Robert Pressman, Cambridge, Mass., with whom Laurence S. Fordham, J. Harold Flannery, Foley, Hoag & Eliot, Rudolph F. Pierce, Keating, Perretta & Pierce, Boston, Mass., Eric E. Van Loon, Cambridge, Mass., John Leubsdorf, Boston Mass., and Nathaniel Jones, New York City, were on brief, for plaintiffs-appellees.

Sandra L. Lynch, Boston, Mass., with whom Timothy J. W. Wise, Asst. Atty. Gen., Boston, Mass., on brief, for state defendants, appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal was filed on December 10, 1975, by the Boston School Committee (the Committee) from orders of the district court designating a temporary receiver for South Boston High School and ordering the transfer, without reduction in pay, of certain of its staff. The question before us is whether under the extraordinarily difficult and troubled circumstances confronting the School in the fall and early winter of 1975, the district court exceeded its powers in entering such orders. The instant appeal does not deal with how long such a receivership may properly last.

First integrated by court order in 1974 ("Phase I"), the South Boston High School was serving a racially mixed enrollment in 1975–76 under Phase II, a citywide desegregation plan formulated by the district court and upheld on appeal to this court. *Morgan v. Kerrigan,* 530 F.2d 401 (1st Cir.), *cert. denied,* —— U.S. ——, 96 S.Ct. 2648, 49 L.Ed.2d —— (1976). In November, 1975, the plaintiffs, representing a class of all black Boston public school students and parents, moved to close the School, alleging that black students there were being denied a peaceful, integrated and nondiscriminatory education. Following a lengthy hearing and several visits to the School, the district court found plaintiffs' basic allegations to be correct, but declined to close the School, ordering instead that it be placed in the temporary receivership of the court, effective December 10, 1975. The court first named as receiver a senior official of the Boston School Department, who was, in fact, the assistant superintendent for the district within which the School was located, but on January 9, 1976, after this appeal was filed, the court appointed Boston's Superintendent of Schools, Marion J. Fahey,

as temporary receiver in place of the previous receiver. The stated purpose of the receivership was to effectuate as soon as possible "such changes in the administration and operation of South Boston High School as are necessary to bring the School into compliance with the student desegregation plan dated May 10, 1975 [Phase II], and all other remedial orders entered by the court in these proceedings, e. g., desegregation of faculty and staff." The court directed the receiver to (1) arrange for the transfer of the School's headmaster, full-time academic administrators, and football coach, without reduction in compensation, benefits, or seniority; (2) evaluate the qualifications of all faculty and educational personnel and arrange the transfer and replacement of whomever he sees fit for the purposes of desegregation, without reduction in compensation, benefits, or seniority; (3) file a plan with the court for the renovation of the School; (4) try to enroll non-attending students and establish catch-up classes; and (5) make recommendations to the court relative to certain provisions of the plan. It is the receivership order and the foregoing directions, including especially those for transfer of staff, which are the subject of this appeal.[1]

I

██ As the district court's primary orders requiring South Boston High School and other Boston schools to be desegregated have been reviewed and sustained, *see Morgan v. Kerrigan, supra,* the time is no longer ripe to consider arguments against Phase II itself. The questions now before us are simply whether the lower court properly determined that plaintiff's rights under the desegregation plan were being violated at

---

1. The Committee also appealed the district court's order imposing a moratorium on acting and permanent appointments by the lame duck School Committee (except with court approval) until January 6, 1976, after the terms of office of its members were to expire. On December 19, 1975, this court declined, after hearing, to stay that order. We knew then that, because of the passage of time, we were in practical effect concluding the appeal. To the extent

this aspect of the appeal may not now be moot, we affirm the district court's order for reasons given in our Memorandum and Order of December 19, 1975.

The Committee has for the present waived its appeal from the district court's order that the Superintendent assume power in place of the Committee over two school department offices, the Office of School Security Service and the Office of Implementation.

South Boston High School, and if so, whether the temporary remedies ordered were reasonable and lawful. We answer these questions in the affirmative. Given the lawfulness of the court's desegregation decrees, there is little question that it had the power to take reasonable steps to ensure compliance therewith and to protect the students attending the city's desegregated schools. The evidence here does not show that the court went beyond what might reasonably be considered necessary to cope with a grave threat to the desegregation plan and to the safety and rights of the black students at South Boston High School.

II

Conditions at South Boston High School which resulted in the challenged receivership and transfer orders are described in the district court's oral and written findings, based on a week-long evidentiary hearing and on affidavits and personal visits to the School. These may be summarized as follows.

Prior to court-ordered desegregation, South Boston High School, consisting of the main building and the L Street Annex, was a white school both as to faculty and students. For example, in 1972–73, of approximately 2200 students, one was black, and of 132 faculty, two were black. From the district court's earlier findings, it seems that the School was involved in many of the segregatory practices which led to the present desegregation plan. *Morgan v. Hennigan,* 379 F.Supp. 410, 426, 427, 428, 438, 441–49, 468–69, 475 (D.Mass.), *aff'd sub nom. Morgan v. Kerrigan,* 509 F.2d 580 (1st Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

A significant black enrollment was introduced for the first time in 1974–75 under Phase I. A litany of the problems that ensued that year is to be found in the district court's findings. Police in large numbers were on hand from the second day of school in September, 1974; there was

tension, disruption, violence, and poor attendance. Black students were often the targets of racial slurs and, on occasion, physical abuse. By the fall of 1975, when Phase II went into effect, South Boston High School was known to be an institution where desegregation was experiencing severe difficulty.

These problems did not abate in the 1975–76 academic year. According to some witnesses they increased. The district court found, "Considering the implementation of the Phase One and Phase Two desegregation plans as a whole, the problems experienced at South Boston High School have been unique in their duration and intensity." A major aspect of the troubles was a continued resistance or imperviousness to integration. South Boston High was found to have remained identifiably white notwithstanding its racially mixed student body. All administrative personnel assigned to the main building, approximately 45 persons, were white, and the court concluded that in the opinion of its administration, the School belonged only to the white students residing in the easterly part of the district which it served. Out of 100 teachers, 93 were white. The 1975–76 student handbook, distributed to every student and mailed to parents of all registered students, portrayed the School as if white, ignoring its newly integrated status. The handbook singled out for praise the South Boston High School Home and School Association,[2] an organization whose principal if not sole activity for the past two years was to oppose court-ordered desegregation. There was but a single passing reference to the court-established Multi-Ethnic Councils, designed to facilitate the desegregation process.

The court found that the black students who had been assigned to the School were being intimidated and mistreated. There was evidence that black students had been physically attacked without provocation by larger groups of white students. There was evidence that black students had been disci-

---

**2.** This organization is not to be confused with the Home and School Association of South

Boston, a separate body which has joined in the school desegregation case as an intervenor.

plined for defending themselves while white attackers went unpunished. Black students were found to have been subjected to continuing verbal abuse, and despite a court-ordered ban on racial epithets school officials did little to intervene. In addition to "familiar racial slurs", white students this year have employed the chant " '2, 4, 6, 8 assassinate the nigger apes' ", and, while changing classes, groups of white students often sing " 'bye, bye blackbird' and 'jump down, turn around, pick a bale of cotton' ". The white student caucus, in a list of demands, requested that music be played over the School's public address system during the changing of classes, since " 'music soothes the savage beasts' ". On numerous occasions, school staff and police stationed inside the building have heard these remarks and chants and failed to take any corrective or disciplinary action.

The court found, moreover, that racial segregation was persisting inside South Boston High School. Black students failed in attempts to join the football team, due in part to the actions of the coach. Black and white students were kept apart when arriving at or leaving School. The races remained separated in the classrooms and the cafeteria. No administrative policy or directive was issued to desegregate classroom seating; a plan for desegregated assemblies remained unenforced; and no effort was made to initiate desegregation in the cafeteria by, for example, having white and black aides eat together. In fact, the headmaster on one occasion reprimanded a black student who attempted to sit at a table with white students for a "provocative" act.

The district court found that actions by the faculty at South Boston High School had served to undercut the implementation of the court's desegregation orders. The football coach had purposefully maintained a white team, and failed to fulfill his affirmative court-ordered obligation to desegregate the team and conduct himself in a non-discriminatory fashion. The court chose not to make findings regarding any other specific members of the faculty, but it did note the attitude of the faculty as a whole. In October, 1975, in response to increasing tensions at the School, the Superintendent's office and the court-created Citywide Coordinating Council sought to send assistance teams into the School. The faculty, however, voted not to cooperate with either group,[3] and the headmaster acquiesced. During the faculty meeting at which one of these proposals was discussed, statements by black teachers about problems at the School drew contradictory comments from white teachers, to the accompaniment of loud applause and cheers of approval. The president of the faculty senate testified that he had neither read nor seen the court desegregation plan and that he knew of no discussions by the faculty of the court-ordered Racial-Ethnic Parent Councils and their student counterparts. Thus, the court had "doubts whether, as presently constituted, the faculty intends to act as a unit to promote implementation of the court's desegregation plan at South Boston High School".

The court also made findings critical of the headmaster, emphasizing, however, that he had never intentionally discriminated against any of the students. In addressing the faculty at the beginning of the school year, the headmaster had stated in substance that educational concerns would have to be subordinated to discipline and security problems. His response to student complaints of a "prison environment" at the School was to put the primary responsibility for changing the situation on the students. Although he testified that there was learning and teaching in every classroom, the court did not find these claims to be substantiated. When the headmaster was asked if he favored black student participation in athletics in view of the totally white composition of the football team, he stated only that it was a good idea for all students to engage in sports. In general, while the court judged the headmaster to be well-in-

---

3. On the second day of court hearings on plaintiffs' motion, the faculty voted to reverse its position and cooperate with the mediation board offered by the Citywide Coordinating Council.

tentioned, it found there was insufficient exercise of leadership to counteract the adverse attitudes in the School and to remedy the problems attendant on implementation of the Phase II plan.

The district court's central impression was that the services provided at South Boston High were "primarily custodial and only incidentally educational."[4] The court characterized the atmosphere as not so much filled with racial tension, or even any tension, as with a "pervasive lassitude and emptiness." Based on its observations, the court also believed the attendance figures of both students and teachers were greatly inflated. It observed an "inconsiderable amount of instruction" in almost all the classrooms visited. Outside the teaching areas, security personnel predominated, most of whom seemed to expect trouble. In all, the court found the school "devoid of the youthful spontaneity that one associates with a high school . . ., [the students] victims of constant cynical surveillance, unconcerned, uninvolved, and cowed".

### III

The district court's findings indicate that, as the court concluded, black students attending the School were not receiving a "peaceful, desegregated education". Rather they were subject to insult, intimidation

and continued segregation. As the Massachusetts State Board of Education aptly states in its brief,

"The situation at the school was rapidly deteriorating, evidenced both by a falling pupil attendance rate and by the very bringing of the plaintiffs' motion. Black students were being driven from the school by conditions there . . . . The denial of constitutional rights, while from more complex sources, was rapidly becoming as effective as if blacks had been barred from entering the school."

Doubtless the difficulty stemmed in no small measure from intentional conduct by private organizations and individuals in the South Boston community.[5] But difficult as was the position of school officials, there was reason to believe that conditions could have been, and still could be, ameliorated by them, and that their active and passive conduct contributed to the grave situation so clearly at odds with the court's prior decrees. The Committee's suggestion that the district court overreacted overlooks both the right of black students assigned to South Boston High School to attend, in safety, a desegregated school and the patent urgency of the situation from the viewpoint of all students. The district court could not shut its eyes to what was taking place.[6]

4. The morale of the School was mirrored in its dismal attendance figures. Daily attendance averaged 60% of enrollment, as compared to the citywide average of 86%, and was the lowest of any district high school in the city and of all high schools except for Boston Trade High. Black students' attendance was on the average significantly lower than white students'. The School's main building had the highest rate of student suspensions of any school building in the city and the L Street Annex the second highest. Suspensions at the two buildings accounted for nearly half of all high school suspensions in the city.

5. The court found the School was "surrounded by evidence of racial hostility". Signs were written on the School buildings and in the surrounding area. "Resist" was painted in large white letters on the south doors of the main building; "Never" was written in large black letters on the wall of the L Street Annex; "Nigger" was written in large white letters on a lamppost on the street adjacent to the School;

and racial slurs were painted on the pavement at most street intersections near the School. Inflammatory leaflets, distributed to white students on their way to School, promoted racial tensions within the School. White parents who participated in organizations such as the court-established Racial Ethnic Parents' Councils were threatened and intimidated, their tires slashed and the windows of their homes shattered by bricks. The South Boston Information Center was found to have promoted successful school boycotts, in violation of state law, Mass. Gen.Laws ch. 76, § 4.

6. Past desegregation decisions provide authority, if any is needed, that the conditions found at South Boston High School were within the district court's power and responsibility to correct. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18–19, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), perpetuation of a school's white identification; *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), physical and verbal abuse of black students by

The question thus boils down to the propriety of the relief that was ordered. A district court's power to fashion and effectuate desegregation decrees is broad and flexible, and the remedies may be "administratively awkward, inconvenient, and even bizarre". *Swann v. Charlotte-Mecklenburg Board of Education,* 401 U.S. 1, 15–16, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971). Remedial devices should be effective and relief prompt. *Green v. County School Board,* 391 U.S. 430, 439, 88 S.Ct. 1689, 20 Ed.2d 716 (1968); *Griffin v. County School Board,* 377 U.S. 218, 232, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). While a receivership has been instituted only once in a reported desegregation case, *Turner v. Goolsby,* 255 F.Supp. 724 (S.D.Ga.1966), receiverships are and have for years been a familiar equitable mechanism. *See* Fed.R.Civ.P. 66; 4 Pomeroy, Equity Jurisprudence § 1330 et seq. (Symons ed. 1941). They are commonly a vehicle for court supervision of distressed businesses, but have not been limited to that role. The Supreme Court indicated many years ago that a receiver might take charge of a company to enforce compliance with the antitrust laws. *United States v. American Tobacco Co.,* 221 U.S. 106, 186, 31 S.Ct. 632, 55 L.Ed. 663 (1911). Receiverships and court-appointed officials with some of the same functions as the receiver here have been approved in other contexts. *See, e. g., Inmates of Attica Correctional Facility v. Rockefeller,* 453 F.2d 12, 25 (2d Cir. 1971); *cf. Lewis v. Kugler,* 446 F.2d 1343, 1351 n. 18 (3d Cir. 1971). Masters have been used extensively to formulate plans and recommendations, one of the present receiver's chief functions. *Morales v. Turman,* 383 F.Supp. 53 (E.D.Tex.1974); *Hamilton v. Landrieu,* 351 F.Supp. 549 (E.D.La.1972). Finally, there is precedent for a district court having desegregation responsibilities to order personnel shifts.

*Morgan v. Kerrigan,* 509 F.2d 599 (1st Cir. 1975); *Davis v. School Dist. of City of Pontiac, Inc.,* 487 F.2d 890 (6th Cir. 1973).

We thus find nothing impermissible *per se* about any of the actions the court took. The test is one of reasonableness under the circumstances. To be sure, direct judicial intervention in the operation of a school system is not to be welcomed, and it should not be continued longer than necessary. But if in extraordinary circumstances it is the only reasonable alternative to noncompliance with a court's plan of desegregation, it may, with appropriate restraint, be ordered. *See infra.*

The receivership here was a means to enlist without delay top Boston School Department leadership to work in conjunction with the court on the troubles of the School. The court utilized the device to ensure priority attention by senior administrators, under court supervision, to South Boston High's unique problems. The more usual remedies—contempt proceedings and further injunctions—were plainly not very promising, as they invited further confrontation and delay; and when the usual remedies are inadequate, a court of equity is justified, particularly in aid of an outstanding injunction, in turning to less common ones, such as a receivership, to get the job done. *Milltown Lumber Co. v. Town of Milltown,* 150 Ga. 55, 102 S.E. 435 (1920); *Columbian Athletic Club v. State,* 143 Ind. 98, 40 N.E. 914 (1895). *See* Note, *Monitors: A New Equitable Remedy?,* 70 Yale L.J. 103, 107–13 (1960).

Had the School Committee then in office been cooperative, a voluntary approach might have summoned similar resources without need for a formal receivership. However, the then School Committee had continuously resisted desegregation,[7] and its

---

white students; *McLaurin v. Oklahoma State Regents,* 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950), segregation within the school; *Cooper v. Aaron, supra,* and *Plaquemines Parish School Board v. United States,* 415 F.2d 817 (5th Cir. 1969), a severe breakdown in the learning process. It was not necessary to show

the school was "burning down", as counsel for the Committee suggested in oral argument, to show a need for judicial action.

7. *See Morgan v. Kerrigan,* 530 F.2d 401, 427 (1st Cir.), *cert. denied,* —— U.S. ——, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976), where we pointed out that "the district court in this case has had

leaders had advised the court on more than one occasion that they would obey nothing but direct orders. The court had reasonable cause, therefore, to discount the likelihood of effective cooperation. It also had reason to fear that even direct orders to that Committee would, as in the past, be met by resistance, subterfuge, or, at very least, delay. Furthermore, the South Boston High School problem came to a head when the membership of the School Committee was in lame duck status, a situation that we may presume further inhibited the likelihood of prompt action through normal channels. Finally, it bears emphasizing that the principal alternative being suggested to the receivership order was to order that South Boston High be closed. That alternative would not only have involved the abandonment of a large and useful facility but would have necessitated the planning, expense, and inconvenience of finding places for some 2000 students. Without expressing any opinion on the propriety of ordering the School closed, it can be said that the district court demonstrated both restraint and wisdom in selecting the receivership option. For all of the foregoing reasons, therefore, we see the district's court's action not as excessive but as reasonably tailored to carrying out the court's responsibilities.

■ Nor do we find unreasonable the transfer of the headmaster, coach and other staff. Apart from finding overt resistance to the segregation plan by the coach, the court also noted adverse faculty attitudes and a lack of leadership by the School administration in implementing the plan. Given the situation that had developed at the School under existing leadership, the court was entitled to conclude that a change in command was indicated. The change tied into the appointment of the receiver, giving the latter, in conjunction with the court, the opportunity, after study, to bring in administrators and perhaps faculty that seemed best able to cope with the

extraordinary difficulties and pressures at the School.

■ It is true that the court's actions, while not reaching beyond the professional School Department, supplanted the supervisory authority of the elected Committee in this area. However, judicial desegregation necessarily involves some displacement of decision-making powers, as we have already witnessed in other aspects of this case, e. g. drawing of district lines, teacher hiring, and so on. And the limitation of decision-making in the schools so as to comply with constitutional rights is not without precedent in other areas. *See, e. g., Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The extent of the court's power is limited to what is required to ensure students their right to a non-segregated education, but within that parameter it may do what reasonably it must. *Cf. Griffin v. County School Board, supra; Faubus v. United States,* 254 F.2d 797, 806 (8th Cir.), *cert. denied,* 358 U.S. 829, 79 S.Ct. 49, 3 L.Ed.2d 68 (1958); *Kasper v. Brittain,* 245 F.2d 92 (6th Cir.), *cert. denied,* 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). The fact that a school committee is elected, not appointed, cannot put it beyond the reach of the law. Elected officials must obey the Constitution. *See, e. g., United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Hawkins v. Town of Shaw,* 437 F.2d 1286 (5th Cir. 1971), *aff'd on rehearing en banc,* 461 F.2d 1171 (5 Cir. 1972).

Here, contrary to the Committee's assertions, we find no evidence of any intrusion by the district court upon the School Committee's right to determine "educational philosophy" except as that philosophy might

to deal with an intransigent and obstructionist School Committee majority. These elected officials engaged in a pattern of resistance, defiance and delay."

impermissibly encourage a racially separate school system. The "limited, general purpose of said receivership", as the lower court stated, is only to bring the School into compliance with the desegregation plan and orders. As the receiver is the Superintendent of Schools, we can see little danger that the receivership will introduce educational policies contrary to those prevailing in the system as a whole. The orders in question were, we find, reasonably limited to matters of proper judicial concern, and, given the problems that have arisen, and the history, they do not exceed the court's powers.[8]

■ We would, however, add a *caveat*. Obviously the substitution of a court's authority for that of elected and appointed officials is an extraordinary step warranted only by the most compelling circumstances. Those circumstances here were the failure of local officials to give effect to the court's desegregation orders in a meaningful manner. The receivership should last no longer than the conditions which justify it make necessary, and the court's utilization of the receivership must not go beyond the constitutional purposes which the device is designed to promote. We have no doubt that the district court will exercise appropriate restraint in this respect and, in particular, will give thought to appropriate conditions under which the receivership can be terminated at the earliest opportunity consistent with the rights of children and parents to a peaceful, non-segregated education.

*Affirmed.*

### ADDENDUM

On March 3, 1976, nearly two months after argument, the Boston School Committee moved to consolidate with the present appeal its appeals from related orders entered by the District Court on December 24, 1975, and December 31, 1975, stipulating "that the only issue presented on such appeals is a determination of the limits of the

District Court's remedial powers in a school desegregation case".

Our examination of the record now before us reveals no error. Both orders authorize certain repairs and supplies at South Boston High School that were recommended by appropriate officials of the Boston School Department, including the temporary receiver. The December 24, 1975 order, totalling $23,950, involved such basics as repairs to toilet stalls, water bubblers, torn window shades, and the like; improvements such as painting certain classrooms; and the purchase of certain sports equipment, such as basketballs, mats, and the like. These were to be accomplished before the end of the Christmas recess. More painting, renovation and further repairs were apparently involved in the order of December 31, 1975.

■ The School Committee does not argue that any of these items are *per se* unnecessary or excessive. Given the problems of the School, the items appear, at least from the record before us, to be intended to repair or make up for deficiencies in normal maintenance and equipment that resulted during the recent period of tension and disruption. Since absenteeism, complaints of a "prison atmosphere", and poor morale generally were prominent among the difficulties the court faced, we cannot say the court went beyond its desegregation powers in taking prompt steps to achieve these repairs and purchases without delay. There is no evidence as to what, if any better procedure was available that would have secured the necessary results over the Christmas recess or soon thereafter, and we assume that the court knew of none. Quite obviously if the School facilities were maintained at a level way below normal, the difficulty of restoring and maintaining a functioning, desegregated School at which learning of any type could occur would be increased. We find no error nor any abuse

---

**8.** We have no occasion to act on the statement of the Boston Teachers Union suggesting that "on remand, this Court should order" the new School Committee to respond with proposals to remedy the South Boston High School situation. The matter is not part of the record before the district court and from which this appeal was taken.

of discretion in these circumstances. The orders are accordingly affirmed.