Tallulah MORGAN et al., Plaintiffs,
Appellees,

v.

John J. McDONOUGH et al.,
Defendants, Appellants.

Nos. 76–1121, 76–1239 and 76–1426.

United States Court of Appeals,
First Circuit.

Argued Nov. 2, 1976.
Decided Jan. 26, 1977.

Francis J. DiMento, Boston, Mass., with whom James J. Sullivan, Jr., Philip T. Tierney, and DiMento & Sullivan, Boston, Mass., were on brief, for appellants.

John Leubsdorf, Boston, Mass., with whom Laurence S. Fordham, J. Harold Flannery, Foley, Hoag & Eliot, Boston, Mass., Nathaniel R. Jones, New York City, Robert Pressman, and Eric E. Van Loon, Cambridge, Mass., were on brief, for appellees.

Before COFFIN, Chief Judge, CAMP-BELL, Circuit Judge, and GIGNOUX *, District Judge.

COFFIN, Chief Judge.

After extended litigation resulting in final decisions that (1) the Boston public schools had been intentionally segregated, largely through the deliberate and wilful conduct of School Committees through the years, *Morgan v. Kerrigan*, 509 F.2d 580 (1st Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), and (2) that a plan of desegregation approved by the district court should be put into effect, *Morgan v. Kerrigan*, 530 F.2d 401 (1st Cir.), *cert. denied sub nom. Morgan v. McDonough*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976), the district court faced a specific crisis threatening to cripple the implementation of the plan—a thoroughgoing deterioration of both order and education in the South Boston High School. The district court refused to adopt the alternative of closing the school and, instead, placed it under receivership on December 9, 1975, later appointing as receiver the Boston Superintendent of Schools. The "limited, general purpose" of the receivership was "to accomplish as soon as feasible such changes in the administration and operation of South Boston High School as are necessary to bring the school into compliance with the student desegregation plan . . . and other remedial orders entered by the court . . . .." This court affirmed the receivership order in *Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976), *cert. denied*, —— U.S. ——, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977).

The present appeal involves five orders in connection with the operation of the receivership. One is the court's "Third Order as to Facilities", entered February 11, 1976. The other four are orders for the appointment of a headmaster and other key officials at South Boston High, entered between April 7 and September 27, 1976. The order as to facilities required the School Committee and its agents to make certain repairs and expenditures for renovation. It is resisted as encroaching on the Committee's statutory authority in the area of building alterations and repairs. The appointment orders pursued a different approach. They were not orders appointing key personnel and requiring only that they be paid. They required that the Committee appoint the persons named by the court—persons who had been nominated by the receiver, the Superintendent of Schools. The orders are resisted on a basis different from, and arguably undercutting, the objection to the facilities order. The Committee argues that, even if an order like the facilities order, i. e., a direct appointment by the court with payment to be made accordingly, was within the court's power, ordering the Committee to appoint was beyond it.[1]

■ The Addendum to *Morgan v. McDonough, supra*, 540 F.2d at 535, is dispositive as to the facilities order.[2] The repairs authorized in the present order, like the earlier ones, were "recommended by appropriate officials of the Boston School Department, including the temporary receiver." *Id*. Indeed, the order was based upon the Plan and Chronology for the Substantial Renovation of South Boston High School submitted by the receiver, Superintendent of Schools Fahey, in response to the original receivership order. The record shows that the planning and implementation of the renovation proceeded with the active participation of many officials of the School Department, notably the Chief Structural Engineer of

---

\* Of the District of Maine, sitting by designation.

1. To quote from the Committee's brief, "[I]t is one thing for the District Court to . . . place [a public high] school under the direct control of the Court, including the hiring of personnel; it is entirely another matter for that Court to dictate how and for whom the members of the Committee will vote, in their public capacities as members of that Committee."

2. In the Addendum we upheld two orders authorizing repairs and supplies at South Boston High School. Our decision as to those facilities orders did not, as the School Committee now argues, turn on the emergency nature of those repairs.

the Department of Planning and Engineering, and that many repairs were accomplished without court order. The School Committee does not argue, as it did not argue with respect to the earlier orders, that any of the items ordered are per se unnecessary or excessive. As we observed previously, "[q]uite obviously if the School facilities were maintained at a level way below normal, the difficulty of restoring and maintaining a functioning, desegregated School at which learning of any type could occur would be increased." *Id.* The contention of the Committee that, under the existing circumstances, it alone may "fix the level of normality" could, if accepted, reduce the receivership to the function of presiding over the shell of a school. We find no error nor any abuse of discretion in the facilities order.

With respect to the orders for appointment of administrative staff, the School Committee concedes that the terms of the receivership dictated replacement of the administrative staff at South Boston High School. As we have noted, the orders in question effectuated this by requiring the filling of key vacancies including that of headmaster with persons designated by the Superintendent of Schools in her capacity as receiver. We have already held that "[g]iven the situation that had developed at the School under existing leadership, the court was entitled to conclude that a change in command was indicated. The change tied into the appointment of the receiver, giving the latter, in conjunction with the court, the opportunity, after study, to bring in administrators and perhaps faculty that seemed best able to cope with the extraordinary difficulties and pressures at the School." *Morgan v. McDonough, supra,* 540 F.2d at 534. The School Committee makes no representation that it wished to participate more actively in the search for new administrators or that, absent court order, it would have appointed individuals committed to making desegregation work at the School. Its only objection at this point is that the district court, instead of itself appointing people to these positions and directing the city's Treasurer to pay them, ordered the School Committee to appoint specific individuals. This, they assert, was an extreme and unwarranted invasion of their prerogatives and responsibilities as elected officials.

■ We begin by noting our concern that the Committee never advised the district court that it preferred the procedure of direct levy on the Treasurer. The court was entitled to assume that the Committee's objection was to the end achieved, not to the technique employed. Had a specific objection been raised to the means, the court might well have considered whether alternative procedures more acceptable to the Committee were available. Nevertheless, the Committee's objection deserves our most serious consideration, for the orders do represent an extraordinary use of authority by the court. And we hope that what we say will be understood, and not misunderstood, by all concerned with the twin problems of managing a school during its traumatic adaptation to a desegregated system and of expediting return of that management to normal administration as soon as feasible. The Committee's argument is powerful when presented as an abstract proposition. Clearly considerations of federal-local comity and of separation of powers dictate that an order-mandated vote be considered a last resort after "less restrictive alternatives" have been found wanting in order to carry out a decree designed to vindicate constitutional rights. But, just as clearly, if that purpose requires some infringement of the normal authority of officials, such extraordinary measures may be taken, since otherwise the court would be put in the untenable position of being unable to enforce its own lawful orders with respect to desegregation.

■ We can perceive no jurisdictional bar to the district court's orders. *Compare* 7 Moore's Federal Practice ¶¶ 65.03[2], 65.-19, 65.20.[3] In the absence of such a bar, the

---

**3.** The Committee cites *Skillken & Co. v. Toledo,* 528 F.2d 867, 878 (6th Cir. 1975), for the proposition that an order of this sort would be "highly improper" and a "violation of the separation

court's equity power is broad and flexible, and the propriety of an order turns on a balancing of individual and collective interests in the particular case. *See Swann v. Charlotte-Mecklenburg Board of Ed.*, 402 U.S. 1, 15–16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970). The test is whether these orders are a reasonable exercise of power, considering both the gravity of the situation that gave rise to the orders and the extent to which they intrude on other important interests.

■ A showing of direct impairment of an outstanding school desegregation order justifies equitable relief that might not otherwise be appropriate, *see Gilmore v. City of Montgomery*, 417 U.S. 556, 571, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974). And, in extreme circumstances, we think it is clear that the equity power of a federal court extends to orders controlling the actions of elected officials in the exercise of their duties. *See, e. g., Griffin v. County School Board*, 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964) (holding that the district court could, "if necessary to prevent further racial discrimination, require the Supervisors to exercise the power that is theirs to *levy taxes* to raise funds adequate to reopen, operate and maintain without racial discrimination a public school system . . . .") [emphasis supplied]; *Swann v. Charlotte-Mecklenburg Board of Ed., supra*, 402 U.S. at 16, 91 S.Ct. 1267 (affirming the district court's order directing the board to adopt one of three desegregation plans or come forward with an acceptable plan of its own); *Wright v. Council of City of Emporia*, 407 U.S. 451, 458, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972) (upholding the district court's order, prompted by the city's otherwise lawful move to establish its own school system, enjoining the city council from taking "any action which would interfere in any manner whatsoever with the implementation of the Court's order heretofore entered"). Admittedly, the orders challenged here directed a very specific exercise of

official power. The test, however, is the same: whether the particular circumstances that confronted the district court justified this particular degree of intrusion into the power of the School Committee.

■ The district court faced the following situation. It had appointed a receiver for South Boston High School for what we have held to be good and sufficient reasons. A premise of the receivership was that much of the school's top staff would be removed, allowing a new leadership team to work unimpeded by old practices and attitudes. The old staff had already been transferred to other schools, and time was pressing if another school year was not to be lost. The district court could reasonably believe that the task of attracting top quality administrators, difficult at best, could not be performed unless the new personnel were assured not only of their salary but also of the same contract terms as to duration of employment, renewal of employment, and conditions of discharge that applied to other administrators in the system. While it might be able, by direct order, to assure the payment of salaries during the receivership, it could not assure the new administrators any expectancy of equal treatment thereafter. Finally, under the circumstances that led to the receivership and decision to change the administrative staff, which are summarized in *Morgan v. McDonough, supra*, 540 F.2d at 531–34, the district court was justified in concluding that formal ratification of the administrative appointments by the Committee was necessary to guarantee that the efforts of the new staff would not be undermined by continued resistance from the Committee and the threat of discharge without just cause. Permanent status was necessary to ensure that the new staff would be able to exert credible and effective leadership toward desegregation at South Boston High School. Otherwise the School could be ex-

---

of powers with the court acting as a legislature." We note that the court in that case also found no violation requiring any remedy, and we read its dictum on the propriety of the hypothetical remedy as invoking separation of

powers as a principle dictating judicial restraint, not a jurisdictional limit on the court's equity power. *See Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 615, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974).

pected to remain in a state of dissension and turmoil while factions within and without sought continually to undermine the authority of those nominally in charge. And we observe that the installation of effective leadership promised to bring about the termination of the receivership as soon as it might be done without jeopardizing the desegregation effort, a concern that the district court undoubtedly shares with us. For all of these reasons, the orders directing the Committee to act were reasonably necessary to effectuate a meaningful and workable desegregation plan at the School. *Cf. Morgan v. Kerrigan, supra,* 530 F.2d at 427.

█ While it is true that delicate problems may arise if "judicial oversight of discretionary appointments . . . interfere[s] with the ability of an elected official to respond to the mandate of his constituency", *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 615, 94 S.Ct. 1323, 1330, 39 L.Ed.2d 630 (1974), we do not believe that such problems are presented in this case. Under state law, the School Committee does not have discretionary power over appointments of administrative staff, but may only appoint persons who have been nominated by the superintendent of schools. Mass.St.1965, c. 208 § 1; Mass. St.1972, c. 150 § 1. The appointees to South Boston High School were in fact nominated by the Superintendent, who is also the temporary receiver, and approved by the court. All but one of the appointments were submitted to the Committee for action in the normal course of business. Only when the

Committee refused to act on the nominations did the court order the later appointments.[4]

We do not think that, in the circumstances of the period between April 7 and September 27, 1976, ordering the School Committee to exercise its power of appointment under state law, which is in effect little more than the power to approve the Superintendent's nominees, constituted impermissible judicial encroachment in the political process. Moreover, we do not feel that a federal court need give undue deference to the desire of elected officials to "maintain credibility" with their constituency by actively and passively resisting the lawful process of desegregation. We do not deny the School Committee members' right to make public their opposition to these orders, as they did by recording with each vote of appointment that "we believe that this order is violative of our duties as elected officials, and we make the following vote under protest and under legal duress . . . .." We would remind the Committee, however, that its duties "must be exercised consistently with federal constitutional requirements", *Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958), and that, beyond this, it could speed and ease the process of desegregation immeasurably by lending its active support and cooperation.[5]

This brings us to the present and, more importantly, to the future. What has been done has been done of necessity. And it has been done to assure a change of policy

---

**4.** Although the Committee had notice of it well in advance, the first appointment, that of Jerome C. Winegar as Headmaster, was not officially submitted to the Committee without court order. However, one may take the change in procedure for later appointments as an indication of the court's willingness to cooperate with the Committee, and we think one may take the Committee's response as an indication that the effort at cooperation was futile.

**5.** "The duty to abstain from resistance to 'the supreme Law of the Land' . . . as declared by the organ of our Government for ascertaining it, does not require immediate approval of it nor does it deny the right of dissent. Criticism need not be stilled. Active obstruc-

tion or defiance is barred. . . . Local customs, however hardened by time, are not decreed in heaven. Habits and feelings they engender may be counteracted and moderated. Experience attests that such local habits and feelings will yield, gradually though this be, to law and education. And educational influences are exerted not only by explicit teaching. They vigorously flow from the fruitful exercise of the responsibility of those charged with political official power and from the almost unconsciously transforming actualities of living under law." *Cooper v. Aaron,* 358 U.S. 1, 24–25, 78 S.Ct. 1401, 1413, 3 L.Ed.2d 5 (1958) (Frankfurter, J., concurring).

and, hopefully, of attitude toward desegregation. The fact that the new personnel at South Boston High have been appointed for a fixed term does not mean, as the Committee argues, that the receivership has been extended indefinitely. But the new appointments do mean that a major step has been taken to achieve the purpose of the receivership: to accomplish "such changes in the administration and operation of South Boston High School as are necessary to bring the school into compliance with the student desegregation plan . . .."

The time, it seems to us, has come for at least serious exploration by the parties and the district court of the possibility that desegregation can continue with the School Committee taking a more responsive, responsible, and positive role, and, as soon as such a role develops, resuming its normal administrative responsibilities in relation to South Boston High School. The School Committee that took office in January, 1976, came to its task with the opportunity to demonstrate its fidelity to the law and to carry it out in the most effective way, whatever might be the personal convictions of its members. But the record of the current year reveals to us a tactic of keeping a distance, of doing the minimum and then only by pressure of court order, and of limited and largely negative communication of its problems and suggestions to the court. It is not surprising that the court has felt that help, if sought, would not be forthcoming from the Committee.

But with the appointment of senior professional administrative personnel with the authority and the experience to lead the school toward peaceful and permanent desegregation, we suggest that the feasibility and wisdom of terminating the receivership, and any conditions that might be prerequisite thereto, be the subject of serious consideration. In saying this, we do not mean to imply that an immediate decision about termination would be the necessary result of any initial effort. Our sense of the

situation is far more restricted than that of the district court. Even with the assurance of security for the new staff which this opinion gives, it may be that termination of the receivership in the near future would involve predictable risks which could jeopardize continued progress toward permanent desegregation. What we do advise is that the district court initiate proceedings, repeated periodically if need be, to determine the feasibility of returning school administration to normal channels. Conditions and attitudes sometimes change subtly, but significantly, even over short periods of time and it is important that means be routinely available to discover such changes.[6] If such feasibility seems demonstrated, and the receivership is terminated, only to find the plan of the court directly or indirectly frustrated, the court may always reinstate the receivership as a documented last resort. The important objective is to avoid the entrenchment of the receivership and to secure a return to normal administration as soon as feasible.

*The District Court's orders of February 11, April 7, June 14, August 20 and September 27, 1976, are affirmed.*

---

6. It may well be that the court already has such a procedure uppermost in its mind. We deem our suggestions today entirely consistent with the caveat in the last paragraph of our opinion of August 17, 1976, 540 F.2d at 535.