**DISTRICT OF COLUMBIA, et al., Appellants,**

v.

**JERRY M., et al., Appellees.**

**No. 98–CV–1571.**

District of Columbia Court of Appeals.

. Argued April 6, 1999.

Decided Sept. 30, 1999.

Walter A. Smith, Jr., Special Deputy Corporation Counsel, with whom John M. Ferren, Corporation Counsel at the time the brief was filed, and Richard S. Love, Special Counsel, were on the brief, for appellants.

Robert L. Wilkins, Public Defender Service, with whom James W. Klein and David A. Reiser, Public Defender Service and Donna Wulkan, were on the brief, for appellees.

Daniel A. Rezneck, Washington, DC, filed a brief on behalf of the District of Columbia Financial Responsibility and Management Assistance Authority as amicus curiae.

Before WAGNER, Chief Judge, and TERRY, Associate Judge, and KERN, Senior Judge.

PER CURIAM:

Appellants, the District of Columbia (District) and the District of Columbia Public Schools (DCPS), challenge an order of the trial court appointing a receiver for education at the Oak Hill Youth Center, a facility maintained by the District for the treatment and rehabilitation of detained and committed children. The question presented by this appeal is whether the trial court erred in granting this extraordinary remedy. While the District's history of compliance with the orders of the court leaves much to be desired, we are not persuaded that the record reveals a sufficient basis for the imposition of this remedy of last resort under the circumstances existing at the time of the entry of the order, and therefore, we reverse and remand.

## I. *Procedural and Factual Background*

This case has a long and unfortunate history. It was commenced in 1985 when

Jerry M., representing a class of detained and committed children confined at the District's facilities for juveniles, filed suit against the District and various District officials[1] contending that they had failed "to provide appropriate care, rehabilitation, and treatment to them in violation of the Constitution and the District of Columbia Code." *Jerry M., supra* note 1, 571 A.2d at 180. On July 24, 1986, the parties entered into a Consent Decree which was approved by the court and entered as a judgment.[2] The Consent Decree provided, among other critical matters, for "minimum standards for staffing and training, improvements in diagnostic services, treatment planning through individual service plans (ISP) and Team leaders, as well as education, recreational, and mental health services and medical services" in the District's facilities. *Id.* at 181 (footnote omitted). Section IV(H) of the Consent Decree, Education and Vocational Programming, provided for the number of educational personnel to be employed, including a principal and assistant principal, certification requirements for teachers, specified student-teacher ratios, academic subjects approximating those available in the D.C. public schools, adequate equipment, materials and resources, and classroom placement according to individual ability. Various deadlines were set for implementation of each of these actions, with the latest to be completed by September 1, 1987. Pursuant to the Consent Decree, a Monitor was appointed to make findings and recommendations "concerning the steps to be taken to achieve compliance [with the Consent Decree]." *Id.* In addition, the Consent Decree established a panel of three experts to "determine the appropriate number of juveniles in need of secure confinement in the District and to develop a system for appropriate care, services, and placement of securely confined juveniles in YSA custody."[3] *Id.*

In the years following entry of the Consent Decree, the DCPS had responsibility for the educational program at the Receiving Home, while DHS and the YSA were responsible for the programs at Oak Hill and Cedar Knoll. Reports of the Court Monitor show that the school at the Receiving Home was generally in compliance with educational requirements. However, the court entered several orders reflecting that the schools at Oak Hill and Cedar Knoll were not in compliance with the educational requirements of the Consent Decree. For example, there was no substitute teacher roster or adequate equipment and supplies at Oak Hill School in 1986. The substitute teacher problem and inadequacy of books and supplies persisted in 1987, and cancellation and curtailment of school days occurred without reasonable justification. There were other violations in 1988, including an improper student-

---

1. The District officials named as defendants in the case included the Mayor, the Director of the Department of Human Services (DHS), the Commissioner of Social Services, the Administrator of the Youth Services Administration (YSA), the Superintendent of Oak Hill, Cedar Knoll and the Receiving Home, and the Superintendent of Special Education of the D.C. Public Schools. *District of Columbia v. Jerry M.*, 571 A.2d 178, 180 n. 5 (D.C.1990).

2. The Consent Decree was based on the following general principles:

 (1) "the right of children to be housed and provided services in the least restrictive setting consistent with the protection of the public, the youth's individual needs and with applicable court rules, statutory and

constitutional provisions"; (2) "the right of a child not to be in secure confinement when capable of functioning effectively in a community based program"; and, (3) "a child should remain in pretrial detention for the shortest possible period and in no event to exceed 30 days or, in the case of a pretrial shelter house placement, 45 days...."

*Jerry M.,* 571 A.2d at 181.

3. The Consent Decree defined the class to be "all children who are or come to be confined in the three juvenile facilities, Oak Hill, Oak Hill Annex (also known as Cedar Knoll), and the Receiving Home for Children, operated by the District of Columbia, for so long as they are in YSA custody." *Jerry M., supra* note 1, 571 A.2d at 181 n. 6.

teacher ratio, lack of a substitute teacher roster, inadequate supplies, and violations of the special education requirements of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1401 *et seq.* In a report to the court filed on March 7, 1989, the Monitor reported that despite some improvements at Oak Hill, many children were not assigned to classes according to abilities, some staff positions were not filled, and there was still no substitute teacher roster and no meaningful vocational program. In a report submitted to the court in 1990, the Monitor reported that in spite of efforts to assist with compliance, Oak Hill School did not have enough special education teachers, lacked a substitute teacher roster, had teachers not certified in their area of specialization, and maintained an inadequate vocational education program. A contempt order was entered related to deficiencies in 1991. Some improvements were noted in 1992, but there were still deficiencies in connection with supplies, vocational education, timeliness of assessments, and special education provisions. In 1993, there were IDEA violations, inadequate teacher certification, inadequate books, equipment and supplies. In 1995, there were problems with children failing to attend classes and an insufficient number of teachers and substitute teachers, and noncompliance with special education requirements continued.

A different judge was assigned to the case who requested a report from the Monitor's expert, Dr. Leone, and the court requested appellants to develop a plan to respond, focusing on education. Many of the teachers at the school were not adequately certified, and a new curriculum had not been implemented as promised. In March 1996, appellants announced their intention to secure the services of the Richard Milburn High School (RMHS) to run the educational programs at the Oak Hill School beginning with the 1996–97 school year. However, RMHS did not commence operation of the school until November 6, 1996, because the contract for services was not signed until mid-October of that year. Teachers were issued reduction-in-force (RIF) notices in anticipation of the transition to contract services. This created problems, which were reported by the Monitor as follows:

> From the day of the RIF notices, the educational program fell to pieces, with teachers using sick leave to look for new jobs or just refusing to come to work, coming in late and leaving early, and spending on-the-job time complaining about the unfairness of the RIF. Records were not kept; there were no special education referrals to the DCPS Diagnostic and Placement team for Oak Hill; diagnostic evaluations were not done, so placement of students in classes was based on little more than intuition; and students were allowed to wander the grounds almost at will.

At an emergency hearing, DCPS placed on the record its reasons for the position that it was not responsible for assisting YSA during the transition to privatization. The court ordered DCPS to provide Oak Hill with fourteen certified teachers, including two in special education, by September 16, 1996, and DCPS complied. According to the Monitor, "[t]he addition of DCPS teachers made the difference between holding school and not holding it."

By Order dated June 24, 1997, the trial court appointed a Special Master to "assist the [appellants] in identifying and correcting deficiencies in the provision of educational services required by the Consent Decree." In appointing the Special Master, the trial court stated that it sought to "initiate the process of judicial action with an effort of minimal intrusiveness to assist, not take over, [appellants'] duties under the Consent Decree."[4] The trial court

4. The trial court indicated that it would consider "more drastic and far-reaching remedies" if [appellants] continued to fail to meet their obligations under the Consent Decree. The trial court then stated in a footnote that "[a]s more and more government functions

found, *inter alia*, that (1) "despite the assistance of the Monitor and the Monitor's experts, and in the face of the Court's remedial Orders I and K, [appellants] have never achieved compliance with the educational requirements of the Consent Decree"; (2) the "appellants have demonstrated an inability to achieve and sustain compliance with the Consent Decree and the Court's remedial orders regarding educational services. Moreover, the Court is convinced that the 'lack of communication and cooperation' ... is likely to recur without Court intervention"; (3) the appellants "conced[ed] substantial non-compliance on educational issues" following a hearing on [appellees'] motion for contempt held on May 9, 1997, foregoing the defense of impossibility of performance; and (4) "[t]here is no factual dispute as to whether the Court has sufficient evidence to find defendants in contempt for violation of the Consent Decree." Among the duties conferred upon the Special Master were the following:

> In Phase One, the duty of the Special Master shall be to use the powers enumerated below to aid [appellants'] compliance with the educational provisions of the Consent Decree. Phase Two of the Special Master's duties will become operational only if the Court concludes that [appellants] have failed to achieve substantial compliance with the educational provisions of the Consent Decree by December 1, 1997.

While Phase One powers essentially involved the preparation of an educational implementation plan and monitoring appellants' compliance with the plan, Phase Two powers gave the Special Master the au-

thority to implement the plan developed in Phase One.

In the First Report to the trial court, the Special Master referenced the " 'Commitment [of the District of Columbia Public Schools (DCPS) ] to Providing Services to Special Education Students at Richard Milburn High School' at Oak Hill, signed on September 25, 1997, by the Acting Executive Director of the Special Education Division of DCPS."[5] After receiving this Report, the trial court issued Order 12, dated October 8, 1997, establishing court-ordered deadlines. Order 12 "incorporated the tasks, target dates and person(s) responsible noted in the [Special Master's] First Report [to the trial court]." Thereafter, the Special Master submitted several reports to the trial court indicating some areas of continued noncompliance.

In anticipation of the 1998–99 academic school year, the District announced its desire to permit DCPS to run the Oak Hill School. On May 12, 1998, after hearing presentations from the newly appointed Superintendent of DCPS, Ms. Arlene Ackerman, and the Director for Alternative Placement, Dr. Ira Thomas, the trial court permitted DCPS to develop a plan for running Oak Hill in compliance with the "Consent Decree, the implementing orders issued by Judge Urbina and this Court, and all federal and state statutory and regulatory requirements." In early June 1998, DCPS presented its plan to run the Oak Hill School to the Special Master for review. The trial court approved the plan over appellees' objection.[6]

On July 13, 1998, the District of Columbia Financial Responsibility and Management Assistance Authority (Authority) approved Management Directive No. 98–1

---

are placed in court-ordered receiverships, this Court may have to consider this option as well."

**5.** "In this Commitment, DCPS acknowledged its responsibility for the evaluation or re-evaluation of students suspected of having or having identified disabilities under the IDEA. DCPS also committed to providing psycholog-

ical services to such students as required by their IEPs."

**6.** Appellees objected "noting the historical lack of involvement and interest by DCPS in Oak Hill, the shortfall in the proposed budget, an inadequate number of teachers and aids, and an overall lack of coordination and planning between DCPS and YSA."

(Directive).[7] At the core of the Directive "was the centralization of power in the DCPS Director of the Alternative Education Program (Director)." The Authority directed the Director, *inter alia*, "to identify highly qualified, certified teachers, with proper credentials for services at [the Oak Hill Youth Center (OHYC)], and the Superintendent of Schools shall appoint them, no later that August 19, 1998 [to satisfy certain teacher-student ratios]...." The Authority also ordered the Director to "appoint a Principal and Assistant Principal for OHYC no later than July 15, 1998." In addition, the Directive: (1) authorized the termination of teachers and employees who failed to meet established performance standards; (2) ordered the implementation of a curriculum-based assessment system for placement decisions, and ordered the installation of "sufficient computers with software necessary to implement the curriculum utilized at OHYC" to be in place by the beginning of the 1998 fall semester; (3) mandated that all books and supplies be available for use by August 24, 1998,[8] (4) charged the Director with coordinating with DCPS Division of Special Education "to ensure the provision of timely and current special education assessments and all related services identified in each child's IEP"; (5) directed the Director to "ensure that YSA unit staff and [Youth Corrections Officers (YCOs)] receive training to act as teacher's aides during the school day and tutors during the evenings and weekends"; (6) directed the Director of DHS and the YSA to hire "[a]n education specialist ... to coordinate and monitor the provision of education services at OHYC"; and (7) directed the heads of District of Columbia agencies "to work with DHS and DCPS or face 'corrective action' by the authority."

On August 17, 1998, the Assistant to the Special Master sent a Memorandum to the Director "to express her concerns about certain personnel, resource and training issues relating to the then-forthcoming commencement of school at Oak Hill, scheduled to begin in two weeks."[9] The Memorandum discussed "the failure of DCPS to extend employment offers to the teachers." The Memorandum further noted "the lack of employment of special education assistants and a special education coordinator." Finally, the Memorandum questioned the plans DCPS "had for training the YCOs for their new assistant/tutor roles." Appellees filed a Motion to Appoint a Receiver for Education on September 3, 1998.

In considering appellees' Motion to Appoint a Receiver For Education, the trial court concluded that it "[r]egretfully ... finds itself in the same position it was in June, 1997, insofar as examining a factual record that establishes numerous violations of the Consent Decree, implementing orders and applicable statutory provisions."

More specifically, the trial court found that: (1) appellants failed to ensure that teachers received competency-based training in the use of the curriculum by the commencement of the 1998–99 academic school year as mandated by the Consent Decree, Order 12 and the Management Directive; (2) as of September 4, 1998, appellants were out of compliance with their duty to hire DCPS-certified teachers as mandated by the Consent De-

---

7. The Authority is an entity which Congress created to address the District's fiscal crisis and to secure sound financial stability and management for the government. D.C.Code §§ 47–391.1 to –393 (1997).

8. *To ensure compliance with this mandate,* the Directive authorized the Director to use emergency procurement rules.

9. The Assistant to the Special Master "noted that the teachers were to be hired by August

19 and that [the Director] had informed teachers that he expected the employment situation to be finalized by August 1, which date was later changed to August 7." The Assistant to the Special Master indicated in the Memorandum that the Director orally indicated that "it was unresolved budget/contract issues between DHS and DCPS that were delaying the hiring."

cree;[10] (3) appellants failed to purchase supplies adequate to meet students' needs as mandated by the Consent Decree, Order 12, and the Directive; (4) appellants were out of compliance with regard to completing special educational evaluations by established deadlines as set forth in the Consent Decree; (5) appellants' ability to provide special education services were "woefully inadequate," in violation of the Consent Decree; (6) appellants stipulated that "individualized curriculum-based assessment is not currently in use" in violation of the Consent Decree and Order 12; (7) appellants had not implemented a teacher compensation program, nor had it appointed teachers as required by Order 12 and the Directive; and, (8) appellants stipulated that "they presently do not have a roster of substitute teachers" as required by the Consent Decree and Order K. The trial court found that the appellees had established these violations by a preponderance of the evidence.

Upon consideration of the previously mentioned reports from the Special Master, and after concluding "that there is no alternative, as yet untried," the trial court appointed a receiver to assume "ultimate control over the education system at Oak Hill ...." To this end, the trial court intended for the receiver to "act to implement the Management Directive and any other steps necessary to achieve a quality education program at Oak Hill through oversight and control of DCPS, YSA and DHS personnel." In appointing the receiver, the trial court left in place "many of the individuals who have labored on behalf of the [appellants] up until now ... hold[ing] these individuals from DCPS, YSA and DHS to the representations they have been making for months regarding their commitment to the youth at Oak Hill." "[T]he Court want[ed the appellants] to be partners in this endeavor and to be

achievers, not obstructers." The power granted to the receiver was to,

> absent further court order, extend through the current 1998–99 academic year, including summer school for 1999. Prior to the end of this period, the Receiver may petition the Court to terminate the receivership if the Defendants demonstrate the capability to operate the Oak Hill school in a manner that provides a quality education and complies with all legal requirements.[11]

On September 25, 1998, appellants filed a timely notice of appeal of the receivership order. On October 23, 1998, appellants filed a Motion to Stay Receivership Order, which was subsequently denied by Order 15 on November 19, 1998.

## II.

On appeal, appellants argue that the trial court erred in appointing a receiver "[j]ust days after the beginning of the new school year and before the recently-appointed School Superintendent had a fair opportunity to make meaningful improvements at the District's Oak Hill Youth Center." Furthermore, appellants contend that the trial court "took this action only eight weeks after Superintendent Ackerman had courageously agreed to assume full responsibility for a troubled program that other public and private entities had for 12 years failed to remedy." They contend that the trial court "took this action even though Superintendent Ackerman had begun to make significant progress at the facility, and [the trial court] took it notwithstanding that [it] had given the Superintendent no notice that [it] intended to judge her based on conditions during the first week of school."

> In summary, appellants contend that the trial court did not and could not conclude, within the first week of school, that Ms. Ackerman was *incapable* of providing effective leadership; was *un-*

---

10. The trial court found that 31% of the teachers at Oak Hill lacked current certification in the areas in which they were teaching.

11. The parties do not suggest that the powers of the Receiver have ceased.

*able or unwilling* to carry out her responsibilities; and that there was *no reasonable prospect* for progress at Oak Hill within a reasonable time. Moreover, in transferring the Superintendent's authority to [its] own appointees, [the trial court] ignored the principle of deference to local authority, which is at its zenith concerning local control over the operation of the public schools. Furthermore, [the trial court] refused to avail [itself] of less drastic, more narrowly tailored remedies which were specifically suggested by [appellants] and were obviously available to address any shortcoming [the trial court] found.

█ The court has the power, pursuant to its equity jurisdiction, to take broad remedial action to secure compliance with its orders, including the power to appoint a receiver. *See Dixon v. Barry*, 967 F.Supp. 535, 550 (D.D.C.1997) (citing *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir.1976) (other citations omitted)). "[C]ourts have appointed receivers to protect constitutional and statutory rights in a variety of circumstances." *Id.* (citing *Morgan*, 540 F.2d at 533) (other citation omitted); *see also LaShawn A., by Moore v. Barry*, 330 U.S.App. D.C. 204, 210, 144 F.3d 847, 853 (1998). Receivers have been appointed "to coerce public officials to comply with legal mandates in a number of factual settings, including public schools, housing, highways, nursing homes, and prisons." *Dixon*, 967 F.Supp. at 550. The appointment of a receiver to act in the place of "elected and appointed officials is an extraordinary step warranted only by the most compelling circumstances." *Morgan*, 540 F.2d at 535. Essentially it is the remedy of last resort, and therefore, should be undertaken only when absolutely necessary. *LaShawn A.*, 330 U.S.App. D.C. at 211, 144 F.3d at 854. In determining whether other remedies are inadequate and receivership remains the only viable option to effectuate compliance with the laws and orders of the court, the court should consider a number of factors. These include: (1) "whether there were repeated failures to comply with the Court's orders"; (2) whether further efforts to secure compliance would only lead to "confrontation and delay"; (3) whether leadership is available which can "turn the tide within a reasonable time period"; (4) "whether there was bad faith"; (5) "whether resources are being wasted"; and, (6) "whether a receiver can provide a quick and efficient remedy." *Dixon*, 967 F.Supp. at 550 (citing *Judge Rotenberg Educ. Ctr., Inc. v. Commissioner of Dep't of Mental Retardation*, 424 Mass. 430, 677 N.E.2d 127, 148–49 (1997), and *Morgan*, 540 F.2d at 533).

█ In this case, the trial court relied principally upon only one of the factors essential for a reasonable exercise of its discretion to impose this extraordinary remedy. It focused upon the history of the District's failure to comply fully with the court's requirements. The District's abysmal response to its mandates for such a protracted period of time, as the trial court found, is a compelling consideration; however, it is not the only one. If that were the only factor for consideration, it would present a compelling case. However, some assessment must be given to the other pertinent factors by which the trial court's exercise of discretion must be guided. Particularly pertinent to the court's consideration here are the unique circumstances in which the District found itself not long before the receivership order was entered. The Congress had established the Authority and delegated to it the power to act so as to secure sound financial and management responsibility for the District government. In that connection, the Authority had taken steps to address various problems with local government, including its educational system. To that end, the Authority appointed an Emergency Transitional Education Board of Trustees to institute reforms in the public schools. It was only in April 1998 that the Authority appointed Arlene Ackerman as Chief Executive Officer/Superintendent of

the D.C. Public School System. The Authority sought an opportunity for the new superintendent to institute a quality educational program at Oak Hill and filed a declaration in support of the District's application to stay the order imposing a receivership. Pursuant to its statutory powers, the Authority issued a Directive on July 13, 1998, which was intended to facilitate the establishment of a program of quality education consistent with the requirements of *Jerry M.* at Oak Hill, with the assistance of the new superintendent. In appointing a receiver, the trial court failed to consider adequately the availability of this congressionally appointed body and its appointee, the superintendent, as bearing upon the factors of leadership availability and bad faith. *See Dixon, supra,* 967 F.Supp. at 550 (citation omitted). Whether a newly appointed receiver could secure compliance more speedily than the duly appointed Authority and its appointee is among the factors which must be weighed. *See id.*

 The decision of whether to appoint a receiver is within the court's discretion. *See Dixon, supra,* 967 F.Supp. at 550 (citing *Fleet Nat. Bank v. H. & D. Entertainment, Inc.,* 926 F.Supp. 226, 233 (D.Mass.1996)). In determining whether that discretion has been properly exercised, we consider, among other things, whether the trial court failed to consider a relevant factor. *See Johnson v. United States,* 398 A.2d 354, 365 (D.C.1979). We conclude that the trial court abused its discretion in appointing a receiver because several important criteria were omitted from the trial court's consideration in this case as above-described. *See Dixon,* 967 F.Supp. at 550. In considering the necessity for this remedy of last resort, it was essential for the trial court to consider, in addition to the past performance of the District under prior circumstances, the availability of new leadership, the brief time that the new superintendent had to act, the capability of new leadership to "turn the tide," the presence of good faith or bad faith at the time, and the prospects for the receiver of providing a speedy remedy. A proper consideration of all of the relevant factors, given the extraordinary nature of the remedy, can lead only to the conclusion that an insufficient basis was shown for the appointment of a receiver under the circumstances existing at the time of the entry of the order.

For the foregoing reasons, the order appealed from hereby is reversed and remanded for further proceedings consistent with this opinion.

*So ordered.*