William DIXON, et al., Plaintiffs,

v.

Marion BARRY, Jr., et al., Defendants.

Civil Action No. 74–285 (AER).

United States District Court,
District of Columbia.

June 13, 1997.

Peter J. Nickles, Matthew S. Yeo, Covington & Burling, Washington, DC, for Plaintiffs.

Richard F. Gondelman, Office of Corporation Counsel, St. Elizabeths Hospital, Washington, DC, for Defendants.

### MEMORANDUM OPINION

AUBREY E. ROBINSON, Jr., Senior District Judge.

This matter is before the Court on Plaintiffs' Motion for Appointment of a Receiver. This case involves the obligation of the District of Columbia (the "District") to create an integrated community based mental health system for the treatment of the mentally ill. This case has been pending for over twenty two years. Unfortunately, during that time period, the District has been unable or unwilling to comply with the Court's orders. Accordingly, as a final, drastic attempt to effectuate the Court's orders, Plaintiffs seek the appointment of a receiver to take charge of the District's Commission on Mental Health Services ("CMHS"). The District vehemently oppose the receivership, claiming that there is neither a legal nor factual basis for its imposition. Upon consideration of the pleadings filed by the parties, the testimony given at a hearing held in this matter from April 14–18, 1997, and the entire record herein, the Court makes the following findings of fact and conclusions of law.

## I. PROCEDURAL HISTORY OF THE LITIGATION

### A. The Initial Dixon Decrees

The Court's involvement in the District's mental health system began in 1974, when the Plaintiff class filed this lawsuit. Plaintiffs are individuals who are or may be hospitalized in a public hospital under the District of Columbia's 1964 Hospitalization of the Mentally Ill Act, D.C.Code Section 21–501 *et seq.*, and who need out placement from the public hospital to alternative care facilities. In summary, Plaintiffs have mental illnesses that are not severe enough to require institutionalization. Rather, Plaintiffs require treatment and other associated services, like housing, in the community. There are approximately eight to ten thousand members of the Plaintiff class.

When Plaintiffs filed this lawsuit, Defendants included both local and federal government officials with authority over the District's mental health system. At that time, Defendants' mental health system was focused on St. Elizabeth's Hospital (the "Hospital"). As such, the great majority of the District's mental health patients were treated in the Hospital. Plaintiffs' lawsuit sought to determine whether this practice violated statutory or constitutional rights of individuals to appropriate treatment in alternative care facilities. At the time of the Court's initial decision in this case, Defendants' clinical staff members estimated that 43% of individuals confined in the Hospital required treatment outside of the Hospital.

In 1975, this Court granted partial summary judgment in favor of Plaintiffs. *See generally Dixon v. Weinberger,* 405 F.Supp. 974 (D.D.C.1975). The Court first determined that Plaintiffs had a statutory right to community based treatment in the least restrictive means. As the Court noted, "[t]he fundamental goal of the 1964 Act was to return the mentally ill through care and treatment to a full and productive life in the community as soon as possible, given the patients' conditions." *Id.* at 976 (footnote omitted). Moreover, Plaintiffs' right to "medical and psychiatric care and treatment" pursuant to D.C.Code Section 21–562 included a right to adequate, individualized treatment based upon each patient's specific needs. *Id.* at 977. The Court then concluded that adequate treatment included treatment in alternative facilities when the Hospital determined that such treatment was appropriate. *Id.* at 978.

After determining that Plaintiffs had a statutory right to alternative care treatment, the Court next determined whether the responsibility to care for patients in alternative facilities was that of the federal or local government. *Id.* at 976. The Court found, given the funding structure of the Hospital and the requirements and legislative history of the 1964 Act, "that the duty to effect placement in alternative facilities where appropriate is a joint one." *Id.* at 979.

Once the Court had determined that there was a statutory right to community based

treatment in the least restrictive means,[1] the parties began the process of determining how to effectuate that right. Thus began the process during which the parties worked together to craft, methods of implementing the *Dixon* Decree. On February 1, 1979, Defendants submitted to the Court a proposed implementation plan. PX 28, at 1. Subsequent to Defendants' filing, the parties began to negotiate and resolve various details regarding the plan. As a result of the negotiation process, and, for the first of many times during the course of the litigation, the parties—Plaintiffs and Defendants—asked the Court to enter a consent decree upon which they had agreed. This led to the 1980 Consent Order and Final Implementation Plan ("1980 Order"). *See generally id.*

The purpose of the 1980 Order was to "establish[ ] a comprehensive system for appropriate residential care and for the provision of the kind and amount of mental health, medical and support services needed by each member of the plaintiff class in the least restrictive setting." *Id.,* at 2. The 1980 Order established the framework for reaching compliance by:

* Requiring Defendants to conduct a needs assessment of members of the class to evaluate what level of services each member required, and to submit to the court a plan describing in what method the Plaintiffs' needs would be met. *Id.* at 3–4.

* Holding government administrators of the mental health system responsible to implement the plan, and requiring that the officials "give priority to implementation of the Plan ... to achieve the goal of full compliance with the Court's mandate." *Id.* at 5.

* Requiring Defendants to submit periodic reports to the Court. *Id.* at 6–7.

* Creating the "Plaintiff's Implementation Monitoring Committee," [2] paid for by Defendants, to "act as [Plaintiffs'] agents

to receive reports, conduct evaluations and investigations, and to assist plaintiff's attorneys in negotiations with defendants concerning implementation of the Plan." *Id.* at 7–8.

* Requiring the parties to negotiate among themselves any disagreements about the implementation plan before presenting any dispute to the Court. *Id.* at 9.

* Requiring that "Defendants shall take all actions necessary to secure full implementation of the Plan and this Consent Order including coordinating with other agencies and officials of the federal and District of Columbia governments." *Id.* at 10.

The 1980 Order anticipated a completion date of December 31, 1985. While the Court saw the 1980 Order as the beginning of the end of the litigation, in hindsight, it is clear that the 1980 Order was only the beginning.

### B. *The 1988 Transfer Act*

In 1984, the United States Congress transferred authority over the Hospital to the District of Columbia. Saint Elizabeths Hospital and District of Columbia Mental Health Services Act, Pub.L. No. 98–621, 98 Stat 3369 (codified at 24 U.S.C. § 225 *et seq.*). In so doing, Congress decided that the responsibility over the local mental health system should be borne by the District. 24 U.S.C. § 225b(a)(1) ("[E]ffective October 1, 1987, the District shall be responsible for the provision of mental health services to residents of the District."). Thus, Congress overturned the Court's determination that the responsibility to implement the *Dixon* Decree was shared by the District and Federal governments.

However, most significantly, Congress affirmed the Court's creation of the *Dixon* Decree. Congress specifically reaffirmed the right of Plaintiffs to treatment in the least restrictive means within an integrated community based mental health system. *See,*

---

1. The Court's finding of a statutory right to community based treatment in the least restrictive means has become known as the *"Dixon* Decree." References herein to the *"Dixon* Decree" are references to Plaintiffs' right to such treatment.

2. The Plaintiffs' committee was subsequently renamed the "Dixon Implementation Monitoring Committee" and shall be referred to herein as the "DIMC."

*e.g.,* 24 U.S.C. § 225(b)(1) (requiring that by October 1, 1991, there exist "an integrated coordinated mental health system in the District which provides—(A) high quality, cost-effective, and community-based programs and facilities"); *id.* § 225(b)(2) (requiring that "the comprehensive District mental health care system be in full compliance with the Federal court consent decree in *Dixon v. Heckler*"); 24 U.S.C. § 225b(c)(4) (requiring that the District prepare a system implementation plan that was "in full compliance with the Federal court consent decree in *Dixon v. Heckler*").

## C. *The 1992 Service Development Plan*

Notwithstanding the Court's view that five years would be sufficient to implement the *Dixon* Decree, the District of Columbia remained wholly unable to do so. Between the Final Plan and 1992, community based treatment for class members in the least restrictive means proved difficult, if not impossible, to achieve. However, the parties made substantial efforts to work together to implement the Final Plan. As a result, the Court approved additional consent orders in March 1987 and June 1989 in an effort to facilitate compliance. However, by 1992, it became clear that the approach of the Court's prior consent orders was unable to help the District achieve compliance with the *Dixon* Decree.

Accordingly, the Court and the parties modified the method used to ensure the District's compliance with the *Dixon* Decree. In January 1992, the Court entered another Consent Order. However, this Consent Order was accompanied by a Service Development Plan ("SDP"). *See generally* PX 26 (Consent Order and SDP). The SDP was the product of "extended and detailed negotiations." PX 25, at 2. The SDP represented a different strategy: "Unlike previous implementation plans that have been negotiated by the parties in the *Dixon* litigation, the SDP set forth in detail the types and numbers of programs targeted for development and establishes a sequential timetable for implementation." PX 26, at 1. Thus, the SDP recognized "that prior orders of the court did not fully detail either the types or amounts of

programs needed, nor a step-by-step time frame for development." *Id.* at 5. Conversely, the SDP "sets forth in detail the types and numbers of programs targeted for development." *Id.*

The SDP's focus was on four "at risk" subgroups of the *Dixon* class: adult residents of the Hospital, elder resident of the Hospital, adults and elders who pose a risk of rehospitalization, and mentally ill and homeless individuals. *Id.* at 16. More specifically, the SDP required that, within five years, the District would:

* Develop and implement appropriate treatment for 164 elders who were currently at the Hospital;

* Develop and implement appropriate treatment for 447 adults who were currently at the Hospital;

* Develop and implement treatment by Mobile Community Outreach and Treatment Services ("MCOTT teams") for 20% of the class; and

* Develop and implement appropriate treatment for 2,500 homeless class members.

*Id.* at 3. More specifically, the SDP included implementation tables that detailed the obligations of the District for Fiscal Year 1992 (Table 6) and 1993–1997 (Table 7). *Id.* at 27–28. Thus, the SDP outlined "a sequential process to phase in new service capacity." PX 25, at 2.

The SDP continued the monitoring role of the DIMC. PX 26, order, at 18–19. In addition, the Court appointed a technical expert to "oversee" the implementation of the SDP. *Id.* at 14–18. Although very detailed, the SDP represented only a limited portion of the District's obligation to provide a community based mental health system for the mentally ill. *See, e.g.,* PX 26, SDP, at 3 ("It is important to note that the Plan does not address the continuing need to restructure and improve services for other *Dixon* class members or other clients of the district's mental health care system."). However, the Court and the parties hoped that the SDP would provide a roadmap for the District's full compliance with the *Dixon* Decree.

### D. *The 1993 Appointment of the Special Master*

As the Court has recognized many times in this litigation, the past is prologue to the future, and, the District failed to meet its obligations under the first year of the SDP. PX 25, at 3. These first year objectives were essential goals upon which future year's implementation targets could be based. *Id.* The Court determined that "the evidence is overwhelming that the District failed to meet its 1992 obligations under the 1992 Consent Order and Plan." *Id.* at 5. The Court so found notwithstanding the commitment made by the District, and the fact that there was sufficient funding. *Id.*

As a result of this lack of compliance with the SDP, Plaintiffs moved for the appointment of a special master. In granting Plaintiff's motion, the Court stated, in what is particularly foreboding for today, the following:

The District's failure to fulfill its obligations under the 1992 consent Order and Plan stem from incapacity, not unwillingness, to do what it had agreed to do and when it was supposed to do it. This failure is consistent with its past failures. Its efforts have not been lacking, but they have been insufficient, ineffective and untimely.... However, [the Court declares] emphatically that twelve years is long enough for the District to perfect and effectuate a system which protects the legal rights and lives of the mentally ill in the community consistent with its statutory mandate and the Judgment of this Court.

Because the District's failure to meet its 1992 obligations under the 1992 Consent Order is not an aberration but a continuation of past practices, the appointment of a special master is appropriate. This is especially true where the District has demonstrated that it can work diligently to meet its obligations under consent agreements when it is threatened with the Court's contempt powers.

PX 25, at 7–8. Accordingly, the Court appointed Dr. Danna Mauch, Ph.D., who had previously served as the expert technical advisor under the 1992 Order, as Special Master. *Id.* at 8.

The Court designed the Office of the Special Master to facilitate and oversee the District's efforts to implement the 1992 Consent Order, SDP, and prior court orders. The Special Master's powers included the ability to require compliance reports, review and comment on implementation plans prior to implementation, make formal and informal recommendations to the parties, mediate disputes between the parties, and periodically report to the Court. PX 25.

### E. *The Phase I and Phase II Agreements*

Despite the assistance of the Special Master, the District continued to fail to comply with its obligations under the SDP. As a result, in March 1995, Plaintiffs filed a Motion for the Expansion of the Powers of the Special Master. PX 23. Plaintiffs' Motion was based upon the Special Master's March 1995 report to the Court. According to Plaintiffs, that report "explains that for a variety of reasons—primarily because of a demonstrated inability to eliminate long-identified barriers to compliance—the District has again failed to achieve compliance with this Court's orders and accompanying SDP." PX 23, memorandum, at 1. Plaintiffs sought to increase the Special Master's powers to that of a receiver.

After the District responded to Plaintiffs' motion, the parties negotiated a settlement of the motion, called the Phase I agreement (or 120 day agreement), which the Court entered on May 25, 1995. PX 22. The Phase I agreement outlined steps to achieve compliance on outstanding 1993, 1994, and 1995 SDP objectives on new service capacity for residential and support services. The District also agreed to increase the outpatient services budget by $12 million, and to hire consultants to review the MCOTT program and management of the CMHS. The District had 120 days to reach these objectives, and failure to do so would subject the District to a specific schedule of fines set forth in the agreement. Additionally, and most significantly, Mayor Barry became involved in the treatment of his city's mentally ill citizens, personally and publicly committing to comply with the SDP. PX 22.

The Phase I agreement marked a high-point in this litigation. The Phase I agreement set down a limited number of important and identifiable objectives. It clearly established the role that the Special Master and the DIMC would play in obtaining these goals. Finally, for the first time a Court order included a specific table of fines in the event of noncompliance. The new approach represented by the Phase I agreement appeared to be a success. The District was largely successful in meeting its targeted goals, and both parties agreed that the District was in compliance. PX 17, at 2.

As a result of the progress made under the Phase I agreement, the parties negotiated and entered into a second agreement, known as the Phase II agreement. *Id.* Under that agreement, entered by the Court on February 7, 1996, Plaintiffs dismissed their motion for a receivership. The Phase II agreement, while significantly broader in scope, continued the strategy of the Phase I agreement. The Phase II agreement established a series of specific and identifiable objectives, including implementing the recommendations of the management audit, hiring personnel, establishing two new MCOTT teams, development of a Homeless Service Plan, and development of a Quality Improvement committee and plan.

The success of the Phase I agreement was, as could be expected, short-lived. The District was unable to sustain and carry out its good intentions under the Phase II agreement. In early 1996, the Court was forced on several occasions to bring the parties into Court to ensure timely payments by the District to service providers. In addition, the Court heard testimony in April 1996 regarding the persistent failure of the District to correct its contract procedures. Moreover, many of the agreed upon deadlines passed, and many of the goals of the Phase II agreement passed without achievement.

As a result, the parties met on August 16, 1996, in which the District admitted that it was substantially not in compliance with the Phase II agreement. PX 15. The District

also promised to immediately correct the situation. They failed to do so to the Plaintiffs' satisfaction, and, as a result of the District's persistent noncompliance with the *Dixon* Decree, Plaintiffs again filed for receivership on December 17, 1996.

F. *Activities Surrounding the Filing of Plaintiffs' Motion for Appointment of a Receiver*

When it became evident that Plaintiffs intended to pursue their Motion for Appointment of a Receiver, the District began to make what for it were lighting quick changes in the CMHS. These changes were an obvious effort to forestall the Court's use of its equitable powers. Most significantly, the Mayor issued two executive orders, Numbers 96–172 (December 9, 1996), DX 1, and 97–6 (January 9, 1997), DX 2, that reiterated the District's commitment to meeting the *Dixon* Decree. More specifically, the Orders attempted to resolve some of the procurement, contracting, and personnel problems by delegating to the Commissioner of Mental Health Services procurement authority over *Dixon*-related services, and personnel authority over *Dixon*-related employees. DX 1, at 1–3. Finally, the Mayor's Orders created the position of *Dixon* Administrator to provide a leadership position directly responsible for facilitating and overseeing compliance with the Court's Orders. DX 1, at 3.[3]

## II. FINDINGS OF FACT ON THE DISTRICT'S CURRENT STATE OF COMPLIANCE

The District is, in short, substantially non-compliant with the *Dixon Decree, and, more specifically, the SDP, as modified by subsequent agreements. During the hearing, several witnesses testified that, in general, the District has fallen woefully short of its obligations. For example, the Court's Special Master, Dr. Danna Mauch, testified at great length and detail about the District's failure to implement the SDP and Phase I and II Agreements. Her report, Plaintiffs' Exhibit 300, is comprehensive and tracks develop-*

---

**3.** Mayor Barry named Janet Maher as Interim Dixon Administrator. DX 2, at 1. Ms. Maher had previously served as the District's lead attorney in this case. To date, Mayor Barry has failed to name a permanent Dixon Administrator.

ments in compliance from 1992 through April 1997. Her assessment is that

> At the present time, significant gaps in compliance continue which are harmful to *Dixon* class members, particularly the most vulnerable individuals who are elderly, at high risk or homeless and seriously mentally ill. As this Report to the Court further details, there are gross deficiencies in treatment practice and therapeutic environment at St. Elizabeths Hospital, certain community mental health centers and certain provider contracted programs. Combined with the harmful gaps in service development and the deteriorated management in the District, urgent action by the Court is required to assure the safety and care of *Dixon* class members.

PX 300, at 3. Similarly, DIMC Coordinator Robert Moon testified that the District has largely failed to comply with its SDP service expansion obligations. He indicated that where the District has met numerical targets, there are concerns about quality. The District has also done a poor job of maintaining existing services. Longstanding contracting and provider payment problems have resulted in service quality erosion and in some cases provider closures. Physical plant and staff hiring and retention problems have negatively impacted the performance of Commission-run services. Similarly, other witness testified that the District has substantially failed to meet the needs of the four targeted subgroups and to create a cohesive system of services.

From a purely quantitative standpoint, the one lone bright spot for the District is with respect to placements of class members out of the Hospital into the community. Over the five years of SDP implementation (January 27, 1992—January 27, 1997), the District agreed to transfer a total of 611 class members, comprised of 447 targeted adults and 164 elders from St. Elizabeths, into homes in the community and to provide them individualized treatment and support. The District has exceeded the target by 20 class member placements for a total of 631 placements in compliance with SDP requirements. However, as detailed below, the District accomplished this objective by placing fewer adults

and more elders than required, and there are major concerns regarding the quality of the placements.

The following is a discussion of the District's obligations with respect to the four groups targeted by the SDP, as amended by subsequent agreements. However, even if the District were in full compliance with these targets, compliance with the full mandate of the *Dixon* Decree would not necessarily follow. The SDP's obligations represent only a portion of what is required to create a truly integrated community based mental health system.

### A. *Adults*

The record clearly indicates that adult class members' treatment needs are not being serviced by the District. Based on Plaintiffs' Exhibit 79, Mr. Moon testified that a substantial decrease in service volume at the Community Mental Health Centers (CMHCs) and in private provider services, a reduction of approximately 41,000 visits in Fiscal Year 1996, indicated that class members were probably not receiving adequate treatment services. Overall, Mr. Moon testified that he found significant noncompliance in the treatment services provided to targeted adults.

Similarly, housing provided to targeted adults did not comply with SDP requirements. As of April 25, 1997, according to transfer summaries received from the CMHS by the DIMC, the District placed 418 adult class members in the community. Thirty-two of the 418 class members were placed out-of-state in implementation year 1993. However, because of concerns raised by the *Dixon* Committee about these out-of-state placements, the Special Master eliminated a number of placements from the compliance totals. As a result, the Court concludes that only 386 placements count towards SDP compliance. This leaves the District 61 placements short of the required 447 placements of targeted adults.

The quality of placements varied significantly. Fifty-seven percent of the 418 class members (or 239) were placed in some kind of licensed adult group home. One hundred and seventy two were placed in Supported

*Residences (SRs); 57 were placed in Supported Rehabilitative Residences (SRRs); and ten were placed in Intensive Residences (IRs). A joint study conducted by the Office of the Special Master, the* Dixon *Committee, the CMHS and Our Turn Advocacy Services entitled "District of Columbia Adult Mental Health System, A Review of Contractor Residential Services," found a high degree of inconsistency in quality across residential program types.* See generally *PX 75.*

The joint study's results were based on a review of 19 randomly selected IR, SRR and SR programs, chosen from a CMHS list of new residential capacity brought on line under the SDP. *Id.* at 4. The study found that class members' needs and preferences did not necessarily match or fit the service received and that the process by which class members were matched to residential service types appeared arbitrary rather than based on an in-depth assessment of consumers' needs and preferences. *Id.* at 32. Additionally, surveyors noted that individual groupings within programs were sometimes incompatible (for example, a mix of ages or behavioral support needs), and resulted in ill feelings between residents, and interpersonal rifts. *Id.* Class members were afforded limited choice, control, and privacy and were asked to comply with house rules that the surveyors saw as stigmatizing and demeaning to adults, including locks on refrigerators and hours when consumers were not permitted in their own home. *Id.*

The system of housing developed under the SDP was seen as "inflexible," meaning residential services were facility-based and not consumer-based. This resulted in the placement of class members in residential programs inconsistent with their needs. *Id.* at 33.

The SDP required the CMHS to create 335 new rehabilitation service options for targeted adults, elder, and homeless class members. Based on information from Plaintiffs' Exhibit 119, Mr. Moon testified that CMHS had created 247 of the 335 required slots for targeted adult, elderly and homeless class members.

Chronic difficulties in hiring and retaining case management personnel at the Community Mental Health Centers ("CMHCs") have impacted the CMHS' ability to maintain case management ratios in compliance with *Dixon* program standards. PX 191–201. In addition to case management, the SDP identified other support services for targeted adults. Mr. Moon testified that the District had developed 16 slots of family support when 61 were required. The District let only one contract for advocacy services with limited staffing when all targeted adult, elderly, at risk, and homeless class members were supposed to receive this service. He also testified that the CMHS has demonstrated only minimal increases in personal care/home health aid and homemaker/chore services capacity.

As indicated by the preceding paragraphs, the overall condition of targeted adult class members is poor. Based on her report, the Special Master testified that "the conditions of adult class members have deteriorated since 1994." PX 300, at 40–41. Dr. Mauch noted that targeted adult class members have neither received adequate treatment when confined to St. Elizabeths Hospital nor appropriate aftercare services that are "high quality and the best fit for their needs." *Id.*

### B. *Elderly Class Members*

The SDP obligated the District to provide treatment services to 164 targeted elderly class members. Mr. Moon testified that a substantial decrease in service volume at the CMHCs and in private provider services indicated that elderly class members were probably not receiving adequate treatment services. Over the five years of SDP implementation, the District was obligated to move 110 targeted elderly class members into community settings and 54 class members into nursing facilities. As of April 25, 1997, the DIMC received documentation from the CMHS of the placement of 257 elderly class members. The District moved 93 more elderly class members from the Hospital than required. Twelve elderly class members were placed out-of-state in Maryland domiciliary care homes in 1993.

The DIMC raised concerns about the Maryland placements in its 1994 Court Report.

PX 51, 154. Ultimately, the Special Master ruled that these placements would not count toward SDP compliance and that the District was obligated to remediate problems in the placements made. However, in her report, the Special Master stated that the District has made "no effort to remediate problems" in the placement of targeted elderly class members out-of-state. PX 300, at 40.

Once the 12 out-of-state domiciliary care home placements are subtracted from the 257 placements made by the CMHS, the result is 245 placements, a surplus of 81 over the 164 placements that the SDP required. Of these, 127(52%) were placements into nursing facilities, more than twice the 54 nursing facility placements required by the SDP. Seventy of the 127 were made to out-of-state nursing homes.

The large number of elderly class members placed in out-of-state nursing facilities prompted a DIMC investigation. The DIMC concluded that elderly class members' rights were being violated with regard to discharge planning and the provision of appropriate aftercare services. PX 68–73. The CMHS disputed the DIMC's findings and the issue was brought to the Special Master. The Special Master confirmed that: (1) in half of the cases reviewed, class members appeared to have been placed in a nursing facility because the specialized housing required by the elderly class member did not exist, not because of a need for 24–hour specialized nursing services; (2) there were serious gaps in the discharge process, including the failure to involve community treatment teams and residential providers in discharge planning; and (3) there was unclear documentation of the involvement of the consumer in the discharge planning process. PX 300, at 18–19.

The SDP required that targeted elderly class members receive two rehabilitation services—day habilitation and psychosocial rehabilitation. Based on information from Plaintiffs' Exhibit 119, Mr. Moon testified that the CMHS had created 247 of the 335 required rehabilitation slots for targeted adult, elderly, and homeless class members. With respect to support services for the targeted elderly class members, chronic difficulties in hiring and retaining case management personnel at the CMHCs have impacted the Commission's ability to maintain case management ratios in compliance with Dixon program standards. PX 191–201.

In addition to case management, the SDP identifies other support services for targeted elders. Mr. Moon testified that the CMHS let only one contract for advocacy services when all targeted adult, elderly, at risk, and homeless class members were supposed to receive this service. He also testified that the CMHS has demonstrated only minimal increases in personal care/home health aid and homemaker/chore services capacity.

Overall, the condition of targeted elderly class members is poor. The Special Master testified and documented in her report that "the conditions of elderly class members have deteriorated since 1994." PX 300, at 40. She found that elders "who remain at St. Elizabeths have suffered from lack of heat, limited food, lack of medicine and medical supplies, deteriorated therapeutic environment, and inadequate discharge planning." *Id.* Those placed in nursing homes and adult care homes have been "neglected, unserved and, in some cases, harmed." *Id.* Plaintiffs' witness Elizabeth Jones, Director of the State of Maryland's Protection & Advocacy agency, testified that the District placed vulnerable elderly class members in Maryland nursing homes that the Maryland Department of Mental Health had decided were unsuitable for its own clients based on concerns about quality. Further, the CMHS violated an "informal" agreement to cease such out-of-state placements and has made no effort to remediate problems brought to light by the DIMC investigations in 1993. PX 300, at 40.

### C. Homeless Class Members

While noting recent improvements, the Dixon Administrator identified housing and services for homeless class members as "the most significant area of noncompliance." PX 10 at 1. Under the SDP, by January 27, 1997, the District was to have placed 625 homeless class members in permanent housing, while maintaining 63 units of transitional housing. As of April 1997, only 185 homeless class members have been permanently housed and

45 of the 63 transitional beds have been developed. Two hundred fifty-one class members were receiving some kind of treatment service. Approximately 181 (68 served by the Community Partnership, 75 served by Anchor Mental Health Association, and 38 served by Community Connections) homeless class members received case management. With regard to rehabilitation services, the SDP obligation was to serve 150. Mr. Moon testified that he was aware that at least 27 of the 247 rehabilitation slots developed are devoted to homeless class members.

The Special Master in her report, Plaintiffs' Exhibit 300, page 41, describes the District's continued neglect of homeless class members as "scandalous." Despite the Phase II Agreement obligation to refocus the CMHS homeless services and bring new services on line before the winter of 1996, the District failed to do so. Despite the overwhelming and very visible plight of homeless class members, the CMHS administration and the CMHCs have been virtually non-responsive. In the absence of a coordinated response by the mental health system, the generic homeless serving community has taken up the slack. Mr. Moon testified that even this patchwork of services is being threatened by substantial cuts to the budget of the Community Partnership for the Prevention of Homelessness.

Homeless class members have suffered significantly as a result of the lack of coordinated services. Although the EPRB Homeless Outreach Program (HOP) has continued to do an admirable job providing outreach and developing life-saving relationships with homeless class members, HOP has almost no place to refer class members once they are ready to receive treatment and be housed. The Special Master reports:

It is well documented by homeless provider and advocacy groups that the health, safety and welfare of all homeless citizens has deteriorated further. Of those in the long-term homeless population (many of whom are class members) co-morbidity of Tuberculosis, HIV/AIDS, and addiction has grown for mentally ill homeless persons.

PX 300, at 41.

### D. Class Members at Risk of (Re)hospitalization

The SDP required that the primary new service capacity for at risk class members was to be Mobile Community Outreach and Treatment Teams (MCOTTs). At the end of 1992, there were to be 4–5 teams which would eventually serve 100 class members per team or 400–500 class members. As of April 14, 1997, only one MCOTT operated out of a condemned building on the campus of St. Elizabeths Hospital, reaching merely 60 consumers. PX 179–190.

Ms. Deborah Allness, the parties' MCOTT consultant, testified about the serious problems that prevent the District from developing MCOTT services and meeting the needs of at risk class members. These problems include a failure to allocate funds to provide appropriate community office space which would be accessible to at risk class members, a cumbersome CMHS hiring policy that hinders the ability of the CMHS-run MCOTT to be fully staffed and fully operational, a contracting process that is largely dysfunctional, an initial total lack of understanding of what MCOTT services are and a continuing lack of organizational ability to support implementation of the service, an overall organization inertia that meant that things only got done when the consultant was physically present to prod activity, and client funds and representative payee systems that are not consumer friendly. Clients for whom the CMHS is payee and whose only source of funds is public entitlements have difficulty in regularly accessing those funds because CMHS management of those funds is so poor. The result is the loss of a hard-won trust between MCOTT clients and their treatment team.

Both the Special Master and Ms. Allness testified that the consequences of the District's failure to serve at risk class members were severe. In her report, the Special Master states, "At Risk class members have swelled the even riskier ranks of those persons who are homeless, imprisoned and lost from the CMHS patient rolls. For some

mentally ill class members, the consequences have gone beyond morbidity to mortality." PX 300, at 40.

### E. *Additional Examples of Noncompliance*

■ The discussion above makes clear that the District has substantially failed to comply with objectives for servicing the targeted subgroups of the SDP. Unfortunately, this tells only part of the picture, for there remains other systemic problems within the District's mental health system. The following is but a short summary of some of those problems.

#### 1. *Financial Issues*

The evidence in this case indicates that the District's lack of compliance stems from poor use of resources, and not a lack of resources. The financial structure of the CMHS evidences the District's focus on a hospital-based system rather than the community based system required by the *Dixon* Decree. Both Mr. Moon and DIMC member Joseph Bevilacqua testified that the CMHS overall budget is sufficient to fund a high quality public mental health system. The problem is the allocation of those funds. PX 79–87. Despite the fact that the St. Elizabeths census has dropped dramatically, a disproportionately large amount of the budget is still spent on Hospital and administrative costs.

Plaintiffs' Exhibit 81 is Dixon Committee expert Howard Cullum's "Report on Financial Assumptions and Reallocation Strategies of the Commission on Mental Health Services Adult Services." Mr. Cullum found that there has been: (1) no "build-up" of community financing; (2) no significant downsizing of St. Elizabeths' budget to parallel out placements; (3) no Title XIX funding to expand community services through rehab and other options; (4) no replacement of one-time settlements on federal reimbursements that are the core of the ASA budget; and (5) continued over-reliance on St. Elizabeths despite the fact that the associated costs undercut the financing of community care.

The Special Master in her report, states that she cannot "confirm the current status of financing with certainty," but reports the following: (1) the CMHS acknowledges little spending in FY '96 on new service capacity; (2) $12 million in increased outpatient expenditures, required in the Phase I Agreement, was not spent; (3) $5 million of unspent Dixon contract funds were recently transferred to cover District personnel costs; and (4) the anticipated gap in federal revenues for the ASA Budget going forward is at least $23 million and possible $29 million. PX 300, at 36. Given these findings, the Special Master concludes

"Finally, the failure of CMHS and the District to heed warnings and citations of deficiencies from OSHA, HCFA and JCAHCO has lead to Notice of Loss of JCAHCO Accreditation, and high risk to continued HCFA Certification. Given the unwise habit of covering virtually all of the ASA Budget with federal funds, despite warnings to the contrary, the future funding of Dixon programs is in grave jeopardy."

*Id.*

Similarly, issues surrounding procurement and payments to providers have continued to prove troublesome for the District. Although the necessary funding is present, the District lacks the necessary mechanisms to utilize properly that funding. Ms. Helen Bergman, founder and director of Community Connections, and President of the Mental Health Coalition, testified that the District's confusing and ineffective procurement process hampers service delivery by mental health providers. Ms. Bergman explained that providers like Community Connections operate with short-term and emergency contracts on a regular basis. Plaintiffs' Exhibits 203, 204, 206, 207, 210–217, document the longstanding nature and seriousness of procurement and provider payment problems. Ms. Bergman's sentiments are corroborated by a March 1996 report by the District's Financial Control Board, entitled "A Crisis in Management: An Assessment of the Contracting Operation of the District of Columbia." PX 74.

#### 2. *Interagency Collaboration*

Because *Dixon* class members are among the District's poorest citizens, they rely on a

number of District agencies. While the CMHS bears primary responsibility for meeting the needs of *Dixon* class members, the SDP outlined the obligations of a number of other District Commissions and Departments to assist in SDP implementation. PX 25, at 30–31. Mr. Moon testified that in general interagency collaboration on SDP implementation has been minimal. He cited as an example that it sometimes takes the Service Facility Regulatory Authority (SFRA) six months to a year (a process that according to DC regulations should at the most take three months) to license a group home. The result is that targeted adult and elderly class members must wait that time at St. Elizabeths in conditions that the Special Master described as less than therapeutic. Additionally, Ann O'Hara testified that the CMHS has failed to develop set aside agreements with the District Housing Authority.

### 3. *Physical Plant Conditions*

Another longstanding problem is the CMHS's failure to adequately maintain the buildings in which class members are served. Conditions at St. Elizabeths have been problematic since the winter of 1996. The Special Master and the parties' MCOTT consultant, Deborah Allness, testified that the buildings where Region 3 CMHC/EPRB and the MCOTT are located also have serious physical plant problems. Despite apparent awareness of the seriousness of the physical plant concerns, very little has been accomplished.

### 4. *Additional Services Gaps*

Based on Plaintiffs' Exhibit 252 and Dixon Committee court reports, Mr. Moon testified that major service gaps continue to exist for class members. The result is that some class members are unserved or under served. Mr. Moon mentioned the following gaps: (1) services for homeless class members; (2) services for at risk class members; (3) dual-diagnosis services for class members who have a secondary substance abuse disorder; (4) specialized housing and supports for elderly class members; and (5) community crisis beds and other services that can prevent unnecessary hospitalizations. The lack of any focused community crisis system looms especially large in the treatment of the District's mentally ill.

At the time of the hearing, only 30 community crisis beds existed. Both Dr. Keisling, EPRB Director, at an interview on April 1, 1997, and Mr. Bernard Cesnik, a DIMC consultant, thought that this was an insufficient number. Moreover, both witnesses thought that the 30 beds were sometimes not used appropriately. PX 300, Attachment 10.

Mr. Cesnik testified to the virtual absence of crisis stabilization or follow-along service as required by the SDP and Dixon program standards. PX 30–44. Mr. Cesnik issued a "Report on the District of Columbia's Mental Health Crisis Services." PX 300, Attachment 10, at 4. Mr. Cesnick found that:

It appears that many [Emergency Psychiatric Response Division (EPRD)] staff conceptualize their job as that of having a single contact with a given client during which they evaluate and refer. There is little evidence of EPRD staff working closely with a given client in a planful way over several days or weeks....

[O]nce hospitalized, EPRD is no longer involved with the client. Neither EPRD nor the [client's] case manager appear to be monitoring the hospital stay or working at establishing what's needed in the community so that the client can be discharged into the array of services necessary for continued stable life in the community.

*Id.*

Mr. Cesnik offered a number of very specific recommendations for improvement of the mental health crisis services system. Mr. Cesnik testified that none of those recommendations had been implemented. Mr. Cesnik also testified that the consequence for class members of this non-system of crisis services was that clients are hospitalized unnecessarily, stay too long, are given referrals that they are too unstable to follow up on, stay in crisis beds much longer than necessary, and are lost back into the community with no service. *Id.*

### 5. Lack of a Quality Improvement System

Despite a set of binding recommendations from the Special Master, now almost three years old, the District still has not established a quality improvement (QI) system for community services. PX 219–227. The District's lack of initiative in the realm of quality improvement was clearly recognized by the Special Master: "Failure to address Quality Improvement obligations represent core noncompliance with the Court's orders and neglect of class members' interests." PX 300, at 35. The lack of any quality assurance programs results in widely divergent quality of services to class members. Three examples are described below.

The closure of JMC Associates and the attendant loss of service capacity, see PX 159–169 and 300, Attachment 1, indicated how the lack of a community services QI system and uneven contract monitoring contribute to variable quality. The result is poor class member outcomes. In this instance, clients did not receive services to which they were entitled under the JMC contracts. Further, a number of class members have alleged the misuse of money that JMC managed for the mentally ill. This misuse involves substantial sums when compared to the limited incomes of many class members. The CMHS was aware early on about the erosion of service quality, but did not take action.

Second, the recent threat to the Hospital's Joint Commission on Accreditation of Health Care Organizations accreditation is yet another example of the failure of the CMHS quality improvement system. PX 243–246 and 300, Attachment 2. The Special Master noted some examples of poor quality in the system that might have been addressed if a QI system had been put in place:

> [C]onsumer dissatisfaction, continuing risk of harm in the hospital and community to these individuals, unnecessarily long lengths of stay in the acute hospital, growing prevalence of untreated/disengaged homeless persons, increased presence of class members in the DC Jail, unsafe, disrespectful and clinically inappropriate treatment sites, reductions in the extensiveness and reliability of information systems, evidence of failure to inform class members and provide choice to these individuals in treatment and placement decisions.

PX 300, at 34.

Third, a close examination of the District's housing obligations under the SDP shows the lack of quality assurance system. Under the SDP and subsequent agreements of the parties, the District was obligated to create 379 units of new housing. According to testimony by Mr. Moon based on Plaintiffs' Exhibit 252, the District has created 349 of the required 379 units of Supported Independent, Supported Residence, Supported Rehabilitative Residence and Intensive Residence housing.

While the mere numbers indicate that the District was largely successful in reaching its housing targets, an examination of the quality of those housing units reveals otherwise. Ann O'Hara, a consultant hired by the Office of the Special Master, wrote a report entitled "Utilization of Housing Resources within the Dixon Service Delivery Plan." PX 126. Ms. O'Hara testified that although the District had created most of the required number of units, she raised concerns that the new capacity and current solicitations for expanded capacity are not designed to accommodate individual specialty needs. Moreover, the District continues to "bundle" funding for housing and treatment services, despite the CMHS's supposed plan to begin implementation of a supported housing program. PX 126, at 10–12.

The Special Master noted in her report that the CMHS still does not have a comprehensive housing tracking system although the District was obligated to have one operational by March 31, 1996. PX 300, at 15. In short, without a quality improvement plan or quality assurance system, the District has no way of monitoring whether the units that it creates satisfy program standards sufficient to comply with the Dixon Decree.

### F. Obstacles to System Reform

The fact that almost 20 years have passed without implementation of the Dixon Decree

is sufficient evidence that there exists significant obstacles to reforming the District's mental health system. General testimony given during the hearing confirms the obvious. For example, Mr. Moon testified that there have been major, and seemingly intractable, challenges to system reform, many of which were identified in 1975 as part of this Court's original order and reiterated in the SDP and 1992 Consent Order. The SDP outlines very specific objectives and strategies for overcoming these barriers. Mr. Moon testified that for the most part, the District has failed to implement those strategies or accomplish the objectives.

Similarly, the Special Master echoed this finding in her report:

> The failure to reform leadership, organization, procurement, quality and finances and the further deterioration of these areas over baseline conditions in 1992 represents abdication of the fundamental role of government to provide for those most vulnerable, disregard for the suffering imposed by abdication, and disrespect for the orders of the Court to meet obligations to ... *Dixon* class members.

PX 300, at 40.

The most significant problem that has hampered system reform has been the lack of sustained leadership at the CMHS. Over the whole history of the *Dixon* case, many key leadership positions have remained vacant for long periods or been filled by acting or interim appointments. Indicative of the leadership crisis at the CMHS, the Commissioner's position was unfilled for over six months.[4] The Special Master described the "CMHS bureaucracy and its 'parent,' the DHS bureaucracy" as in "disarray." PX 300, at 28. While recognizing the new Commissioner's commitment to system reform, the Special Master unfortunately noted that "dedicated mental health professionals have 'been here before' and been confounded by the Byzantine bureaucracy and politics of the District." *Id.* She added "compounding this history is the increasingly diluted authority of the Mayor, from whom the Commission's power to act is derived." *Id.*

The new Commissioner represented in court that she has the full support of the local government and the District's Financial Control Board to comply with the Court's orders. However, an internal memorandum from DHS Interim Director Wayne Casey to City Administrator Michael Rogers identified the local laws that would have to be changed to eliminate judicial supervision of local social service programs. PX 173. This memorandum states Mr. Casey's opinion that if "the local statutory basis for [treatment of the mentally ill in the least restrictive means] was changed, it could be argued that plaintiffs' no longer have a cause of action." PX 173, at 3. Such an attitude results in grave concern from the Court about the District's commitment to the treatment of the mentally ill.

Finally, despite the competent assistance of Dr. Mauch, the Office of the Special Master has been unable to turn the tide of compliance with the *Dixon* Decree. Dr. Mauch testified that the Office of the Special Master's limited power and authority inhibited its ability to affect change and the development of a comprehensive community-based mental health system in the District for both targeted and non-targeted subgroups of the *Dixon* class. PX 300, at 44.

In summation, the same problems in the delivery of mental health services in the District have been documented time and time again. Recommendations for improvement and for overcoming barriers to reform have been suggested or developed through a collaborative process. Technical assistance from some of the nation's best system reform and mental health experts has been provided. Yet, for class members very little has changed.

Since 1975, class members have been entitled to services in the least restrictive setting consistent with their needs. Mental health technology has now advanced to the point where this should be a reality for many, if not all, members of the *Dixon* class. Even urban areas, with many of the same challenges as the District, have developed responsive, consumer-driven systems of care.

---

4. Mayor Barry appointed Ms. Eileen Elias as Interim Commissioner on April 1, 1997.

Unfortunately, the District government seems incapable of replicating successful models and instituting real system reform.

### III. GENERAL LEGAL STANDARDS FOR APPOINTMENT OF A RECEIVER

■ Pursuant to its equity jurisdiction, a federal court has power to take broad remedial action to effectuate compliance with its orders. This equitable power includes the power to appoint a receiver. *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir.1976); *Bracco v. Lackner*, 462 F.Supp. 436, 455 (N.D.Cal.1978); *see also Petitpren v. Taylor Sch. Dist.*, 104 Mich.App. 283, 304 N.W.2d 553, 557 (1981) (noting that a trial court "may appoint a receiver in the absence of a statute pursuant to its inherent equitable authority"). While traditionally courts appoint receivers to protect tangible property of a business pending a judicial determination of a related lawsuit, various courts have appointed receivers to protect constitutional and statutory rights in a variety of circumstances. *Morgan*, 540 F.2d at 533 (noting that receivers "are commonly a vehicle for court supervision of distressed businesses, but have not been limited to that role"); *Bracco*, 462 F.Supp. at 455 ("Although a receivership is usually imposed to supervise a distressed business, Pendente lite, it has also been used to protect and preserve important rights of interested parties.").

■ Moreover, it is abundantly clear that a court may appoint a receiver to force public officials to comply with court orders. *See, e.g., Morgan*, 540 F.2d at 534–35 (holding that the district court's supplementation of local decision making with a receiver was justified given the local authority's failure to comply with the court's desegregation orders); *The Judge Rotenberg Educ. Cent., Inc. v. Commissioner of the Dep't of Mental Retardation*, 424 Mass. 430, 677 N.E.2d 127, 148 (1997) ("Public officials who fail to abide by legal standards are not immune to these remedies.... A court with equity jurisdiction has the discretion to appoint a receiver to take over the main functions of public officials." ) (citations omitted). Courts have used receivers to coerce public officials to comply with legal mandates in a number of factual settings, including public schools, housing, highways, nursing homes, and prisons.

■ Whether or not to appoint a receiver is within this Court's exercise of its judicial discretion. *Fleet Nat. Bank v. H & D Entertainment, Inc.*, 926 F.Supp. 226, 239 (D.Mass.1996). The appointment of a receiver must be reasonable under the circumstances. *Shaw v. Allen*, 771 F.Supp. 760, 762 (S.D.W.Va.1990). The most significant factor in the propriety of appointing a receiver is whether any other remedy is likely to be successful. *Id.* ("When more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances a court acting within its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate.") *Newman v. Alabama*, 466 F.Supp. 628, 635 (M.D.Ala.1979) ("When the usual remedies are inadequate, a court is justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction."); *Bracco*, 462 F.Supp. at 456 (noting that a receiver is a "remedy of last resort; a receiver should not be appointed if a less drastic remedy exists"); *Petitpren*, 304 N.W.2d at 557 (finding a receiver appropriate only when "other approaches have failed to bring compliance with a court's orders, whether through intransigence or incompetence").

■ In evaluating whether a receivership is really the only remedy left for the Court, the court should consider whether there were repeated failures to comply with the Court's orders, whether continued insistence that compliance with the Court's orders would lead only to "confrontation and delay," if there is a lack of sufficient leadership to turn the tide within a reasonable time period, whether there was bad faith, and whether resources are being wasted. *Rotenberg*, 677 N.E.2d at 148–49 (internal quotations and citations omitted). Finally, and perhaps obviously, the Court must consider whether a receiver can provide a quick and efficient remedy. *Morgan*, 540 F.2d at 533 ("Remedi-

al devices should be effective and relief prompt.").

## IV. CONCLUSIONS: APPLICATION OF THE LEGAL STANDARDS TO THE FACTS OF THIS CASE

### A. Legal Basis for the Appointment of a Receiver

The District makes one substantial legal attack on whether a receiver is appropriate. Based upon the principles of comity and federalism, the District argues that the Court should respect, rather than interfere with, the operation of the local government. The District starts with the presumption that Plaintiffs' motion for appointment of a receiver is based solely on a violation of local law. As a result, the District believes that the Court is without authority to impose a receiver on a local government without a federal statutory or constitutional basis. See D's Opposition at 17; D's post-hearing memorandum at 11–12. Secondly, the District argues that because Plaintiffs' legal claim is based upon local law, "a federal court should be extremely reluctant to impose a receivership over the operations of local government, assuming it is empowered to do so at all." *Id.* at 18; *see also* D's post-hearing memorandum at 1 (stating that "principles of federalism and comity require federal courts to consider carefully the extent to which they may interfere with the operations of local governments").

█ This litigation presents a unique factual situation regarding whether the motion for appointment of a receiver is based solely on local law. The Court is convinced that the history of this litigation eliminates the District's arguments as a threshold matter because the Court's orders are not based solely on local law, but upon an explicit directive from Congress. The District is correct in stating that, although passed by Congress, the 1964 Act upon which the Court based its finding that Plaintiffs are entitled to treatment in the least restrictive means is a local law of the District of Columbia. However, in 1984, Congress eliminated any argument that Plaintiffs' motion is based solely on local law by the Transfer Act. In the Transfer Act,

Congress explicitly and without qualification mandated that the District comply with the Court's orders in this case. Thus, although the legal predicate for the suit was local law, Congress explicitly authorized full use of the Court's remedial powers to effectuate compliance. Accordingly, based on that federal Congressional directive, the Court has the authority to, within the governing legal standards, utilize any tool of law or equity available to any federal court to protect against violations of federal law.

█ Moreover, regardless of the legal predicate for the Court's orders, the Court believes that the District's principle of restraint is not, given the dire circumstances facing the mentally ill, factually applicable. The Court is aware of the *Morgan* court's admonition that "the substitution of a court's authority for that of elected and appointed officials is an extraordinary step warranted only by the most compelling circumstances." *Morgan,* 540 F.2d at 535. However, given the current status of the Congressionally mandated community mental health system, such extraordinary and compelling circumstances are presented here. When dire facts justify the use of the receivership power, considerations of federalism and comity do not warrant withholding a necessary remedy. *See Glover v. Johnson,* 855 F.2d 277, 286–87 (6th Cir.1988) (noting that "before a district court undertakes to override the prerogative of state correctional authorities ... it must assure itself that no less intrusive means of bringing about compliance with constitutional requisites is available" and holding that principle of federalism and comity justified reversing appointment of a receiver when the district court failed to provide any factual justification for the receivership). Such dire facts that severely impinge upon the quality of life of the District's mentally ill citizens justifies resort to the court's equitable powers, not withstanding the Court's respect for the locally elected authorities.

█ In addition, the Court finds that the repeated failure of the District to comply with the Court's orders eliminates any basis for judicial restraint when remedying noncompliance. Several courts have noted that when the local authority repeatedly fails to

comply with the court's orders, there is no basis for judicial respect or restraint when the facts justify a receiver. For example, in *Shaw*, 771 F.Supp. at 763, the court noted that:

> Normally, however, separation of powers principles dictate that duly elected public officials be permitted to operate within their respective spheres without interference from another branch of government. And, certainly, principles embodying federalism further prohibit the federal judiciary's interference in state or local government. But where the actions or omissions of elected public officials, whether representatives of federal, state, or local government, impermissibly infringe on the constitutionally protected rights of individuals, including prisoners, federal courts as interpreters and, most importantly, protectors of the United States Constitution must act to stop such infringement.

Similarly, in evaluating whether a state court must respect the state executive and not appoint a receiver, the Massachusetts Supreme Court recently stated:

> We begin by pointing out that appointing a receiver is not a per se violation of the separation principle. When necessary, the role of the judicial branch in civil cases is to provide remedies for violations of the law, including violations committed by the executive branch. Therefore, appointing a receiver to restore legality to a State agency which has failed, over a long period of time, to comply with the settlement agreement and abused its regulatory authority by acting in bad faith, does not derogate the separation principle. To the contrary, when the executive persists in indifference to, or neglect or disobedience of court or-

ders, necessitating a receivership, it is the executive that could more properly be charged with contemning the separation principle.

*Rotenberg*, 677 N.E.2d at 149–50 (citations and internal quotations omitted).[5] The message of these cases is simple: where the local authority's failure to comply with court orders provides no factual basis for respecting the local authority, the court need not withhold use of its equitable powers based on the theoretical principles of federalism and comity.

In twenty two years the local authorities in this case have repeatedly failed to comply with the Court's orders. The result is that, as the above factual findings make clear, the District is far away from the community based mental health system mandated in 1975. Accordingly, the District provides no plausible basis for respecting the authority of the local government such that the Court is without a legal justification to impose a receivership.[6]

Accordingly, the Court finds that the District's legal arguments against the imposition of a receiver are without merit. Thus, the Court turns to the issue of the whether there is a sufficient factual justification for a receivership.

### B. *Factual Basis for the Appointment of a Receiver*

#### 1. *There is a Factual Basis for Fuller Use of the Court's Equitable Powers*

Quite simply, the District is not and has never been, with perhaps the exception of the Phase I agreement, in substantial compliance with any substantive Court order in the history of this case. As the Court's factual

---

**5.** The Court realizes that the District's arguments rest in the federal-state relationship and not in the relationship among coequal branches of government at issue in *Rotenberg*. However, the principle of the *Rotenberg* case is analogous.

**6.** Even assuming for the sake of argument that the District correctly asserts that this action is based solely on a local law, the District has failed to show how that distinction makes a difference. The District has not argued that this Court does not have jurisdiction over this action. Accordingly, once jurisdiction is established, the Court has all equitable remedies at its disposal. The

Court can, provided that appropriate legal and factual justification exists, use any of those remedies to cure a violation of any law, local, federal, or constitutional. While the Court agrees with the District that there is no precedent for a federal court to impose a receivership based upon a violation of a local law, the District has pointed to no specific authority to the contrary. If ever there was such a case that justified use of equitable powers based on a violation of local law, given the complete failure of the local government, this is the case.

findings make clear, the District today is not much closer to a community based mental health system then it was five, ten, fifteen or even twenty years ago.

These factual findings are supported by an overwhelming body of evidence. Document after document and witness after witness confirm that the District has failed to develop the community based mental health system mandated by the *Dixon* Decree. The citations to the record contained herein represent only a snapshot of the evidence supporting the Court's conclusions. The record leads to the undoubtable conclusion that the District has simply failed to comply with the *Dixon* Decree, and, in the process, has failed to properly treat its mentally ill residents.

Despite the excellent efforts of its lawyers, even the District can not seriously contest this inevitable factual conclusion. As a result, none of the evidence put forth by the District alters the finding that, as of the date of the hearing in this matter, the District has not substantially complied with the SDP. Instead of mounting a challenge against this somewhat obvious factual conclusion, the District argues that the situation is not nearly as bleak as it appears. Rather, the District argues that it continues to make progress and, as such, will continue to move closer to full compliance without the imposition of a receiver. Virtually the entirety of the District's arguments on the facts surrounds what the District intends to do in the future. For example, the District cites the appointment of a new commissioner, the creation of the *Dixon* Administrator position, modifications to the structure of the CMHS, procurement and contracting modifications, and the like as evidence that it is improving. *See generally* Defendants' Opposition at 5–15. The District also adduced much testimony during the hearing regarding the recent personnel and procurement modifications, and the positive effect that such changes will have on the ability of the District to reach compliance. Accordingly, the District argues that the severe sanction of a receiver is not necessary, given its recent efforts.

The Court is respectful of the District's attempt to effectuate real change in its mental health system. Unfortunately, this is a song that the District has sung many times before. Given the repeated failure of the District to do what it has promised, either by way of consent order, side agreement with Plaintiffs, or simple proclamation to the Court and to the public, the Court can not again take the District on faith. The Court simply is in no position to rely on the District's assurances of improvement. The long and frustrated history of this litigation provides no basis upon which the Court can put such trust in the District. Rather, the history of this litigation is that the District repeatedly has made promise after promise about what it would do, but has substantially failed to so do.

This failure to fulfill its promises is evident from the top leadership of the District on down. Only when threatened with the Court's intervention does the District make substantial efforts. For example, in 1995, when threatened with Plaintiff's Motion for Expansion of the Powers of the Special Master, the Mayor showed up and committed his full authority to complying with the Court's orders. This led to the Phase I and II agreements, and to Plaintiffs withdrawal of their motion. However, once the motion was withdrawn, the level of compliance, and, more significantly, commitment, diminished rapidly. Now, when again faced with the specter of a receiver, the Mayor once again has pledged his commitment to serving the *Dixon* class members. Unfortunately, the court is convinced that once the specter of a receiver is erased, so to will the District's promises of improvement be erased.

What the District intends to do in the near future is irrelevant, given the history of this litigation, to the question of whether a receiver is mandated. To determine if the receiver is appropriate, the Court must look at the facts as they exist today. Those facts indicate that the District is not in compliance with the mandates of the *Dixon* Decree. The Court can not accept as a factual justification for not appointing a receiver that the District will improve, for that has been the litigation posture of the District for as long as the Court can remember.

### 2. A Receiver is the Only Reasonable Remedy

The Court is convinced if ever there was a factual and legal basis for the use of a "remedy of last resort," this is the case. Despite the assistance of the Court, the Special Master, the DIMC, numerous mental health consultants, and Plaintiffs' counsel, the District still could not comply with its obligations under the SDP. The Court has taken a number of different tacks in an effort to force the District to comply with the *Dixon* Decree, including general consent orders, specific implementation plans with numerical targets, the appointment of an expert technical assistant, and the appointment of a special master. Unfortunately, notwithstanding the extraordinary performance of Dr. Danna Mauch as Special Master,[7] each of these less severe remedies has resulted in little—if any—sustained success.

Each and every factor relied upon by other courts for imposing a receivership favors a receivership under the facts of this case. The District has repeatedly been unable to comply with the Court's orders for *seventeen* years. The Court has tried every conceivable alternative remedy. There is a persistent lack of leadership, both within the CMHS and the District itself, that is focused on compliance with the Court's orders. Use of the Court's contempt power has resulted only in actions by the District sufficient to end the threat of contempt, and has not resulted in advancing the District closer to compliance. The budget of the CMHS, while sufficient to fund the District's mental health services, is consistently mismanaged and wasteful of resources. Finally, the actions of the District in seeking ways to evade the Court's orders could support a finding that the District has acted in bad faith.

Quite simply, a receiver is the only remedy available that presents any reasonable possibility of success. Only a receiver varies significantly from what the Court has tried unsuccessfully thus far. Only a receiver provides the Court with enough day to day authority to force compliance without causing confusion and ambiguity in the administration of the CMHS. The appointment of a receiver is simply the next logical step in the progression of remedies used in this litigation. While the Court recognizes that this is a severe step, the Court must take this step to ensure the District's future compliance with the *Dixon* Decree.

## V. CONCLUSION

■ For twenty two years, this Court has witnessed the failure of the District of Columbia to provide its residents with an integrated community based mental health system. As a result, mentally ill residents of the District of Columbia are suffering. Lost among the numerical details contained in the Court's findings is the fact that the failure of the District of Columbia to properly treat its mentally ill citizens significantly decreases the quality of their lives and, in many cases, threatens their very existence. There is no doubt that without severe action by the Court, such suffering and loss of life will continue unabated. Accordingly, the Court has no choice but to impose a receivership on the District of Columbia's Commission on Mental Health Services. Without a receiver, the Court is convinced that mentally ill residents of the District of Columbia will never obtain the integrated community based mental health treatment to which they are entitled.

### ORDER

Upon consideration of Plaintiffs' Motion for Appointment of Receiver, the Opposition thereto, Plaintiffs' Reply to that Opposition, and the evidence and argument presented by the parties, it is by the Court this 13th day of June 1997,

---

7. The Court, both on its own behalf and on behalf of the community in which it serves, gives Dr. Mauch sincere thanks for her assistance with this case. Dr. Mauch has been an invaluable assistant to the Court. The failure of the District to comply with the SDP is in no way reflective of the quality of Dr. Mauch's service.

The Court has no doubt that Dr. Mauch could and would be an excellent candidate to serve as a Receiver. However, due to professional and personal commitments, Dr. Mauch is unavailable to so serve. Accordingly, it is with much regret that the Court will, by the Order entered with this opinion, discharge Dr. Mauch from her service as *Dixon* Special Master.

**ORDERED**, that Plaintiffs' Motion for Appointment of Receiver is **GRANTED;** and it is

**FURTHER ORDERED**, that a receiver will be appointed with the responsibility and authority to implement the Consent Order and Service Development Plan ("SDP") adopted by the Court in January 1992, as well as all previous and subsequent orders of the Court related to the development of a community-based mental health system in the District of Columbia; and it is

**FURTHER ORDERED**, that the parties and the Special Master shall confer regarding the selection of a receiver. If the parties are unable to agree upon a receiver within thirty (30) days of the date of this Order, the parties and the Special Master shall submit nominations to the Court and the Court will thereupon appoint the receiver; and it is

**FURTHER ORDERED**, that the receiver shall have the following duties and responsibilities:

1. To develop within the District of Columbia an integrated and comprehensive community-based mental health system. The resulting system shall provide all class members with timely and accessible care and shall serve class members in the least restrictive setting commensurate with their individual needs.

2. To oversee, supervise, and direct all financial, contractual, legal, administrative, and personnel functions of the CMHS, and to restructure the CMHS into an organization that is oriented toward advancing the objectives described in the preceding paragraph.

3. To maximize federal revenues for the implementation and operation of a community-based mental health system, and to work with federal authorities and local service providers to ensure that federal funds are dispersed in an efficient manner.

4. To preserve, protect, manage, buy, sell, and administer all property and assets of the CMHS.

5. To develop and improve management systems, performance standards, and quality improvement measures within the CMHS, and to improve relations between the CMHS and its employees, clients, and contractors.

6. To established working relationships with the District of Columbia government, the District of Columbia Financial Responsibility and Management Assistance Authority (hereinafter, "Control Board"), the Chief Financial Officer of the District of Columbia, the United States Congress, and federal agencies as necessary to achieve the purposes of this Order.

7. To establish a work plan for submission to the Court not later than six months after the date of this Order. The work plan shall include: (1) a review of current conditions within the CMHS as they relate to the fulfillment of this Order; and (2) a statement of specific objectives and tasks that the receiver will undertake to fulfill this Order, and the time frame within which they will be accomplished.

8. To report to the Court every six months thereafter on: (1) major actions taken within the preceding six months; (2) progress made toward achieving the objectives set forth in the initial report; and (3) any modifications or additions to the objectives and tasks that the receiver has undertaken in fulfillment of this Order.

9. To develop a plan for the post-receivership governance and administration of the CMHS, which shall include consideration of the structure, funding, and governmental responsibility for the long-term operation of the District of Columbia's mental health system; and it is

**FURTHER ORDERED**, that the receiver shall have all powers necessary to fulfill this Order, including, but not limited to:

1. All powers over the CMHS currently exercised by the Commissioner of Mental Health Services, the Director of Human Services, and the Mayor of the District of Columbia.

2. The power to establish personnel policies; to create, abolish or transfer positions; to hire, terminate, promote, transfer, evaluate, and set compensation for staff.

3. The power to negotiate new contracts and to renegotiate existing contracts, including contracts with labor unions.

4. The power to restructure and reorganize the management and administrative divisions of the CMHS.

5. The power to acquire, dispose of, modernize, repair, and lease property.

6. The power to establish the budget of the CMHS and to work with the Control Board, the Chief Financial Officer, the City Council, and Congress in negotiating and securing approval for said budget.

7. The power to petition the Court for such additional powers as are necessary to obtain compliance with this Court's Order; and it is

**FURTHER ORDERED**, that the receiver shall make reasonable efforts to exercise his or her authority in a manner consistent with: (1) the laws and regulations of the District of Columbia; and (2) the authority and directives of the Control Board and the Chief Financial Officer. However, where those laws, regulations, and entities clearly prevent the receiver from carrying out the duties and responsibilities set forth in this Order, the receiver may petition the Court to waive any requirements imposed thereby; and it is

**FURTHER ORDERED**, that the Dixon Implementation Monitoring Committee ("DIMC") shall continue its work of monitoring the development of a community-based mental health system. The DIMC shall confer with the receiver and the parties as appropriate, and shall continue to provide status reports to the receiver, the Court, and the parties in accordance with its past practices; and it is

**FURTHER ORDERED**, that the receiver shall consult on a regular and ongoing basis with class members and other consumers, mental health service providers, and other stakeholders in the District of Columbia's mental health system. The receiver is encouraged, in this regard, to promote consumer involvement in the planning, evaluation, and delivery of *Dixon*-related services; and it is

**FURTHER ORDERED**, that the receiver shall have access to all relevant District of Columbia personnel, records, and facilities. Nothing in this Order shall be construed to limit the work of the receiver to the CMHS or the Department of Human Services; and it is

**FURTHER ORDERED**, that the Defendants shall pay the receiver a reasonable fee for his or her services. Within thirty (30) days of his or her appointment, the receiver shall submit to the Court a statement of proposed fees and expenses for the implementation of this Order. The parties will then have seven (7) days in which to comment on this submission. In the absence of a showing that the proposed fees and expenses are unreasonable, this Court shall order Defendants to pay the proposed fees and expenses. The receiver's proposed fees and expenses may include the retention of staff members and consultants; and it is

**FURTHER ORDERED**, that the Defendants shall be responsible for all costs incurred in the implementation of the policies, plans, and decisions of the receiver relating to the fulfillment of this Order; and it is

**FURTHER ORDERED**, that the receiver shall be indemnified in the same manner and to the same extent as other agency heads within the District of Columbia government; and it is

**FURTHER ORDERED**, that upon appointment of the receiver, the Special Master shall submit a final report and accounting, and upon the Court's acceptance of the final report and accounting, the Court will discharge Dr. Danna Mauch as Special Master; and it is

**FURTHER ORDERED**, that this Order shall remain in effect until such time as the SDP and the orders of this Court have been fully implemented, and the receivership is no longer necessary to assure the ongoing operation of the District of Columbia's mental health system in accordance with all legal requirements.